

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-31-1994

# USA v. Raven

Precedential or Non-Precedential:

Docket 93-5578

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"USA v. Raven" (1994). *1994 Decisions.* Paper 173.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/173

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 93-5578

_____

UNITED STATES OF AMERICA

vs.

DONALD RAVEN

Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. Criminal No. 93-00128-1)

_____

ARGUED MAY 12, 1994

BEFORE:  BECKER and LEWIS, Circuit Judges,
and POLLAK, District Judge[*].

(Filed  October 31, 1994)

_____

Mary Ann Mullaney (ARGUED)
Office of the Federal Public Defender
800 Hudson Square
Suite 350
Camden, NJ  08102

        Attorney for Appellant

_____

[*]     Honorable Louis H. Pollak, United States District Judge for
        the Eastern District of Pennsylvania, sitting by
        designation.

Edna B. Axelrod
Glenn J. Moramarco (ARGUED)
Office of United States Attorney
970 Broad Street
Room 502
Newark, NJ  07102

Attorneys for Appellee

_____

OPINION OF THE COURT
_____


LEWIS, Circuit Judge.

Appellant Donald Raven pleaded guilty to conspiracy to import heroin into the United States from Thailand in violation of 21 U.S.C. § 963.  On appeal, he challenges the sentence imposed by the district court.  We will affirm in most respects, and remand only for resentencing.

I.

In early 1993, Raven's grocery business was experiencing financial difficulty.  Hoping to save his business, Raven tried to contact Tunde Amosa Taju, a friend who had once helped Raven find work as a drug courier.  Raven had previously transported heroin from Thailand to the United States as a courier, and he sought to make some money this time by either recruiting couriers for Taju or acting as a courier again himself.

When Raven tried to telephone Taju at his home, he was unaware that Taju had been arrested on drug charges and was in jail.  Nor did he know or suspect that Taju was cooperating with

the government.  Upon learning of Raven's call, Taju informed the Drug Enforcement Administration ("DEA") that Raven had tried to contact him.  The DEA directed Taju to solicit Raven's services as a courier and to persuade Raven to find other couriers to assist Taju in importing heroin into the United States.  Taju was also instructed to set up a meeting between himself, Raven and DEA Special Agent Gregory Hilton.

Taju did as he was told.  In mid-February, 1993, at a hotel in Newark, New Jersey, Taju introduced Hilton to Raven as someone seeking drug couriers to import heroin from Bangkok, Thailand, into the United States.  During this meeting, Raven said that he wanted to help Taju and Hilton and explained his previous involvement in drug importation.  He also produced his passport and the passport of Denise Ramirez, whom he had recruited to act as an additional courier.

Approximately two weeks later, Raven and Ramirez met with Hilton and Taju at a diner in Elizabeth, New Jersey.  Hilton produced an itinerary of the proposed trip to Bangkok from New York City and agreed to supply Raven and Ramirez with airplane tickets and expense money to use during their trip.  Hilton told Raven that he wanted to import a minimum of three to four kilograms of heroin, which would be hidden in the lining of two or three suitcases.  Hilton further commented that "it would not be worth the trip if we didn't bring back at least four kilograms" (Appendix ("App.") at 50), and Taju said that two or three suitcases would hold up to eight and one-half kilograms of

heroin. Raven responded that he would retrieve whatever amount of heroin Hilton wanted.

Approximately a week later, Raven and Hilton met again, this time in a hotel parking lot in Newark. At this meeting, Hilton told Raven that his Thailand supplier now wanted to export as much as eight kilograms of heroin. Raven continued to express his willingness to assist, stating that he could supply additional couriers and reiterating that he would bring back into the United States whatever quantity of heroin Hilton requested. Hilton later testified that Raven specifically agreed to transport eight kilograms of heroin from Thailand to the United States at this meeting.

Shortly thereafter, in a conversation on the telephone, Hilton advised Raven that the supplier in Bangkok had again increased the amount of heroin they wanted transported. According to Hilton, Raven agreed this time to transport what would amount to up to twelve kilograms of heroin.

The final meeting between Raven, Ramirez and Hilton was scheduled to take place at a hotel in Elizabeth, where Raven and Ramirez were going to pick up their airplane tickets and advance money. Upon entering the hotel, Raven and Ramirez were arrested. In a post-arrest statement, Raven said that he was going to the Orient to pick up heroin and that he expected to make approximately $60,000 for his efforts. Raven and Ramirez were charged with conspiracy to import eight kilograms of heroin in violation of 21 U.S.C. § 963.

Raven pleaded guilty to a superseding information charging him with conspiracy to import an unspecified amount of heroin in violation of 21 U.S.C. § 963. The plea and superseding information came about because although the parties agreed that Raven had violated 21 U.S.C. § 963, they disagreed as to the weight of the heroin for which he should bear responsibility. In their plea agreement, the parties requested that the court determine at sentencing the weight to be used in calculating Raven's offense level pursuant to United States Sentencing Guidelines ("Guidelines") section 2D1.1.

At the sentencing hearing, the district court correctly noted that Raven's base offense level would be the same -- 34 -- if he was found responsible for any amount between three and ten kilograms of heroin. See Guidelines §§ 2D1.1(a)(3) and (c)(5). Next, the district court found that, based on the negotiations that had occurred, Raven should be held responsible for "three to four" kilograms of heroin for purposes of sentencing. This determination gave Raven a base offense level of 34, which was adjusted downward to 31 for acceptance of responsibility. Raven's criminal history category placed him in a sentencing range that would have been between 108 and 135 months, but the court recognized that Congress had provided that defendants convicted of a violation involving more than one kilogram of heroin face a mandatory minimum sentence of ten years (see 21 U.S.C. § 960(b)(1)(A)), making Raven's adjusted Guideline range 120 to 135 months. The court sentenced Raven to 120 months'

imprisonment, and this appeal followed.  We have jurisdiction under 18 U.S.C. § 3742.

## II.

Raven advances three challenges to the district court's sentencing decision:  (1) the district court erred in failing to properly apply Application Note 12 to Guideline section 2D1.1 in determining Raven's offense level; (2) the district court erred in refusing to depart downward on the ground that Raven was the victim of "sentencing entrapment"; and (3) the district court erred in finding that Raven was predisposed to import three to four kilograms of heroin.  Only his first claim requires extended discussion.

## A.

Raven's primary contention on appeal concerns the district court's quantification of the amount of drugs to be attributed to him for sentencing purposes in what was obviously an uncompleted narcotics trafficking arrangement.  Under the Guidelines, the offense level used to determine a sentence for a drug offense is based initially upon the weight of the controlled substance for which the defendant is held accountable.  See generally Guidelines §§ 2D1.1 et seq.  Application Note 12 to section 2D1.1 provides, in pertinent part:

> In an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution is used to calculate that amount.  However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount

> that it finds the defendant did not intend to
> produce and was not reasonably capable of
> producing.

Guidelines § 2D1.1, Application Note 12 ("Note 12") (emphasis added).  It is the meaning of this Note -- and especially its final sentence, italicized above -- that forms the core of Raven's dispute with the government and the district court.  Raven contends that the district court erred in applying Note 12, and that this error resulted in an incorrect base level for his offense.  We have jurisdiction to review this claim because Raven "allege[s] the district court committed legal (i.e., procedural) errors when imposing [his] sentence."  United States v. Georgiadis, 933 F.2d 1219, 1222 (3d Cir. 1991).

### 1.

The parties agree that in cases involving uncompleted drug distributions, the government generally bears the burden of proving the weight of drugs under negotiation, just as it bears the burden of proving the weight of drugs at issue in any drug sentencing proceeding.  See United States v. McCutchen, 992 F.2d 22, 25 (3d Cir. 1993).  The parties disagree, however, about which party bears the burden of proving the applicability of the final sentence of Note 12, which addresses whether a defendant intended to produce and was reasonably capable of producing the negotiated amount of drugs.  Resolving this issue requires two distinct inquiries.  First, what is the nature of the burden -- does the party with the burden have to demonstrate both intent and capability (or their lack), or is it sufficient to

demonstrate either intent or capability (or, again, their lack)?

Second, who has the burden -- the government or the defendant?

Although we have not directly addressed these questions,[1] they have generated a surprising variety of responses among our sister circuits.[2] Not only have the courts of appeals

---

[1]. In United States v. Reyes, 930 F.2d 310 (3d Cir. 1991), a defendant contended that there was insufficient evidence to support the district court's findings that his conspiracy involved more than five kilograms of cocaine and that he was a leader or organizer. We stated that "[w]ith respect to these sentencing adjustments, the government bore the burden of persuasion by a preponderance of the evidence." Id. at 315. At least one court has interpreted this statement as having addressed and resolved the issue of who bears the burden of proving intent and capability in an unconsummated drug transaction. United States v. Smiley, 997 F.2d 475, 481 n.7 (8th Cir. 1993). Reyes, however, did not address that issue.

In United States v. Rodriguez, 975 F.2d 999 (3d Cir. 1992), we ruled that the defendants in a drug conspiracy could not be held responsible for the full weight of an alleged "mixture" of boric acid and cocaine because the cocaine and boric acid simply were not a "mixture" as described in Guideline section 2D1.1(c) as interpreted by the Supreme Court in Chapman v. United States, 500 U.S. 453 (1991). Noting that the Guidelines allow sentencing courts to "look beyond the amount of drugs actually seized and consider the negotiations" in making a determination of base level (id. at 1088, citing former Guideline section 2D1.1 n.1, the predecessor to Note 12 (see infra n.2)), we observed that "the government produced no evidence of availability to the defendants of three kilograms of cocaine and that the district court made no finding that a higher guideline range was justified by any ability of defendants to deliver in fact three kilograms of cocaine . . . ." Id. at 1008. However, we did not purport to decide who bore the burden of persuasion regarding the last sentence of Note 12 or to elucidate the nature of that burden. In any event, the result in Rodriguez is wholly consistent with the result we reach today, since in Rodriguez the defendants' lack of intent to actually sell three kilograms of cocaine was uncontested (id. at 1006), and we concluded that the government had not demonstrated that the defendants had the capability to produce three kilograms, either (id. at 1008).

[2]. Most of the decisions interpreting the language at issue in this case were actually discussing the predecessor to Note 12 --

split,[3] but some have been unable to establish a consistent application of Note 12 even among panels.[4]  And a panel of the

(..continued)
Note 1 to then-Guideline section 2D1.4.  See United States v. Hendrickson, 26 F.3d 321, 330 (2d Cir. 1994); United States v. Brooks, 957 F.2d 1138, 1150 (4th Cir. 1992); United States v. Christian, 942 F.2d 363, 368 (6th Cir. 1991); United States v. Gessa, 971 F.2d 1257, 1262-63 (6th Cir. 1992) (en banc); United States v. Ruiz, 932 F.2d 1174, 1183 (7th Cir. 1991); United States v. Barnes, 993 F.2d 680, 683 (9th Cir. 1993).  But see United States v. Pion, 25 F.3d 18, 24-25 (1st Cir. 1994) (addressing Note 12); United States v. Legarda, 17 F.3d 496, 499 (1st Cir. 1994) (same), United States v. Tillman, 8 F.3d 17, 19 (11th Cir. 1993) (same).  As the Second Circuit noted in Hendrickson, the Sentencing Commission deleted Guideline section 2D1.4 and transferred the relevant language of Note 1 of that section to Note 12 of section 2D1.1, effective November 1, 1992.  Hendrickson, 26 F.3d at 330 n.6 (citing Amendment 447 to the United States Sentencing Guidelines, Guideline Manual, Appendix C, 269-71).  Because the text of Note 1 to former Guideline section 2D1.4 and the pertinent portion of Note 12 to current section 2D1.1 are identical, in the text we discuss these courts' holdings as if they had interpreted the relevant portion of Note 12.

[3].    The Ninth Circuit has found that Note 12 allocates the burden of persuasion to the defendant to prove that he or she lacked both intent and capacity to produce the drugs under negotiation.  United States v. Barnes, 993 F.2d 680, 683 (9th Cir. 1993).  The Seventh Circuit, by contrast, has found that the burden is on the government to prove both a defendant's intent and his or her capacity.  United States v. Ruiz, 932 F.2d 1174, 1183-84 (7th Cir. 1991).  The Eleventh Circuit has found that the government bears the burden of persuasion, but that it satisfies that burden by showing either intent to produce or reasonable capability of producing the negotiated amount of drugs.  United States v. Tillman, 8 F.3d 17, 19 (11th Cir. 1993); cf. United States v. Brooks, 957 F.2d 1138, 1150-51 (4th Cir. 1992) (government did not contest it had burden of persuasion, and Fourth Circuit found that the negotiated amount should be used unless defendant lacked both intent and ability to complete transaction).

[4].    In United States v. Christian, 942 F.2d 363 (6th Cir. 1991), the Sixth Circuit found that once the government establishes the negotiated amount of drugs, it is the defendant's burden to prove that he was not "capable of producing that amount."  Id. at 368.  The Christian court did not address

Second Circuit has recently taken the extraordinary step of

rejecting the note's language, finding that it "obscured" the

government's obligation in every drug conspiracy case involving

unconsummated transactions to prove a defendant's intent to

produce the negotiated amount.[5]

(..continued)
whether the defendant must prove both lack of intent and lack of
capability, but because intent was not contested by the
defendant, the necessary inference of the Christian court's
holding is that the defendant would have been entitled to
sentencing according to a lesser amount of drugs if he had proven
a lack of ability to produce the negotiated amount.  However,
Christian's vitality is put in question by the Sixth Circuit's
subsequent ruling in United States v. Gessa, 971 F.2d 1257 (6th
Cir. 1992) (en banc).  Without explicitly overruling Christian,
the Sixth Circuit, sitting en banc, nevertheless reached
conclusions directly contrary to those of the Christian panel.
According to Gessa, the government has the burden of proof, see
Gessa, 971 F.2d at 1266 n.7 (majority) & 1280 (Krupansky, J.,
dissenting), but the government's burden would be met by showing
either a defendant's intent or his or her reasonable capability
to produce the negotiated amount of drugs (id. at 1265).  Other
courts have also issued conflicting opinions.  In United States
v. Legarda, 17 F.3d 496 (1st Cir. 1994), the First Circuit ruled
that the government bears the burden of proving both intent and
capability to produce the negotiated amount of drugs.  Id. at
499-500.  However, in United States v. Pion, 25 F.3d 18 (1st Cir.
1994), another panel, without referring to Legarda, subsequently
ruled that Note 12 is conjunctive -- that is, the district court
should base its sentence on the negotiated amount unless it found
that the defendant lacked both the intent and capability to
produce that amount.  Pion, 25 F.3d at 25.  Finally, a recent
panel of the Second Circuit frankly acknowledged that prior
panels of that court had reached differing results on the issue
of whether the last sentence of Note 12 should be read as
conjunctive or disjunctive.  United States v. Hendrickson, 26
F.3d 321, 335-36 (2d Cir. 1994).

[5].    In Hendrickson, the Second Circuit rejected the plain
language of the application note because it had "enmeshed the
base offense determination in quandaries of form to the exclusion
of substance."  Hendrickson, 26 F.3d at 336.  Instead, the court
ruled that the government bears the burden of proving the
defendant's "intent to produce the contested quantities of
narcotics" in every case, but that "failure to produce" -- that

We turn first to the question of what must be proven before a court may discount the negotiated amount in an unconsummated drug transaction and instead impose a sentence based on some lesser amount.  This issue is straightforward:  as Note 12 clearly states, the sentencing court must find "that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount," and again the amount to be excluded is limited to the amount "the defendant did not intend to produce and was not reasonably capable of producing." Note 12 (emphasis added).  In other words, the final sentence of Note 12 is conjunctive, not disjunctive:  for a defendant to be sentenced on a lesser amount, the sentencing court must find both lack of intent and lack of reasonable capability.[6]  Accord, e.g., United States v. Pion, 25 F.3d 18, 24-25 (1st Cir. 1994); United States v. Brooks, 957 F.2d 1138, 1151 (4th Cir. 1992); United States v. Barnes, 993 F.2d 680, 682 (9th Cir. 1993); United States v. Tillman, 8 F.3d 17, 19 (11th Cir. 1993).

The more difficult question, however, is who bears the burden of persuasion on the issues of intent and capability.  To
(..continued)
is, lack of ability -- "is relevant only to the extent it suggests an absence of intent or agreement."  Id. at 337.

[6].    The issue dividing the Hendrickson panel (see supra n.5) is not present and need not be decided here.  We note, however, that insofar as Note 12 states that the sentencing court must find "that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount) (to reduce drug quantity) the majority opinion in Hendrickson contains a useful insight:  although a conspiracy is defined by the parties' agreement, so that the critical factor is the intent to produce (or carry) the drugs, lack of ability might well bear upon the existence of intent and on the scope of the agreement.

resolve this issue, we start with the uncontroversial principle that the government bears the burden of establishing the amount of drugs for which a defendant shall be held responsible in an unconsummated drug transaction. McCutchen, 992 F.2d 22, 25 (3d Cir. 1993); accord, e.g., United States v. Hendrickson, 26 F.3d 321, 332 (2d Cir. 1984); United States v. Ruiz, 932 F.2d 1174, 1184 (7th Cir. 1991). Thus, even in a case implicating the final sentence of Note 12, the government must first prove the amount of drugs that was the object of the conspiracy -- that is, the amount that was negotiated. The government can meet this burden by referring to the presentence investigation report, which, if "unchallenged by the defendant is, of course, a proper basis for sentence determination." United States v. McDowell, 888 F.2d 285, 290 n.1 (3d Cir. 1989). Alternatively, the government may present evidence at the sentencing hearing establishing the amount of drugs that the parties had settled upon (which, in fact, it did in this case).

Once the government makes its prima facie showing that a particular amount of drugs was negotiated, the defendant who wishes to be found responsible for a lesser amount of drugs must come forward with evidence supporting the proposition that he or she lacked both the intent and the reasonable capability to produce the drugs in question. As we explained in McDowell, "the party challenging" the government's prima facie case at a sentencing hearing "has the burden of production, under Rule 32(c), to come forward with evidence that tends to indicate" that the evidence relied upon by the government "is incorrect or

incomplete." <u>McDowell</u>, 888 F.2d at 290 n.1.[7]  In order to meet this burden of production, the defendant may cast a different light on the government's evidence, elicit evidence of his or her own during cross examination of any witnesses offered by the government, or present other evidence suggesting lack of intent and lack of reasonable capability.

The ultimate burden of <u>persuasion</u>, however, does not shift to the defendant in a case implicating the final sentence of Note 12.  To the contrary, as explained above, that burden remains at all times with the government.  Thus, if a defendant puts at issue his or her intent and reasonable capability to produce the negotiated amount of drugs by introducing new evidence or casting the government's evidence in a different light, the government then must prove <u>either</u> that the defendant intended to produce the negotiated amount of drugs <u>or</u> that he or she was reasonably capable of doing so.[8]

---

[7].   Although <u>McDowell</u> was specifically addressing a defendant's challenge to a presentence investigation report, the discussion of a defendant's burden of production applies with equal force in the current context.

[8].   We do not imply that the government must necessarily introduce further evidence to meet this ultimate burden.  For example, it is not hard to envision situations in which a court could easily conclude that the defendant's theory is mistaken or that his or her evidence does not undermine the government's evidence of the amount of drugs involved in the unconsummated transaction.  We merely emphasize that the ultimate burden of persuading a court that the defendant intended to produce or was capable of producing the amount the government claims was negotiated rests with the government.

Distributing the burdens of production and persuasion in this manner most closely adheres to the language, logic and intent of Note 12. We recognize that the last sentence of Note 12 could be read as an exception to the general rule that courts should use the weight of drugs under negotiation to determine a defendant's base offense level. Under that reading, the first part of Note 12 would establish a defendant's base offense level, and its last sentence would result in a reduction to the base offense level, as a mitigating factor, in certain circumstances. If this interpretation were adopted, the defendant would properly bear the burden of proving entitlement to a reduction in offense level under McDowell, where we explained that:

> [T]he burden of ultimate persuasion should rest upon the party attempting to adjust the sentence. Thus, when the Government attempts to upwardly adjust the sentence, it must bear the burden of persuasion. This prevents the criminal defendant from having to "prove the negative" in order to avoid a stiffer sentence. . . . Conversely, when the defendant is attempting to justify a downward departure, it is usually the defendant who bears the burden of persuasion.

McDowell, 888 F.2d at 291 (citation omitted).

However, it is more reasonable to read Note 12, in its entirety, as addressing how a defendant's base offense level may be determined in the first instance when a drug transaction remains unconsummated, for it is important to bear in mind that calculating the amount of drugs involved in criminal activity neither aggravates nor mitigates a defendant's sentence; rather, it provides the starting point (a "base offense level," in

Guidelines terminology) from which a district court can proceed to make adjustments for factors that do, indeed, aggravate or mitigate the sentence. Thus, given that the government bears the burden of establishing the amount of drugs for which a defendant should be held accountable, the government should likewise be required to prove a defendant's intent or capability to produce a negotiated amount of drugs if those issues are called into question by the defendant.

In reaching this conclusion, we reject the suggestion offered by the government at oral argument that the burden of persuasion related to the last sentence of Note 12 is best placed on the defendant because evidence and information about his or her intent and capability is uniquely in the defendant's hands. Reasoning such as this has often been the basis for assigning burdens of proof to various parties in civil cases. See, e.g., United States v. Continental Ins. Co., 776 F.2d 962, 964 (11th Cir. 1985).[9] But in a case such as this, involving a courier defendant, the government's reasoning simply does not support imposing the burden of proof on a defendant. While we can conceive of a seller or buyer defendant having sole possession of and access to information about his or her intent and ability to sell or purchase a certain amount of drugs, the proposition may

---

[9]. We note, however, as one commentator has observed, that the practice of assigning burdens of proof on particular matters to those who have greater access to the facts in issue "should not be overemphasized. Very often one must plead and prove matters as to which [one's] adversary has superior access to the proof." 2 McCormick on Evidence § 337 at 429 (4th ed. 1992).

be rendered less likely when a defendant has been convicted of transporting (or, in this case, agreeing to transport) drugs for others.  In the latter category of cases, the government may be just as able to prove intent and capability as the defendant is able to prove their absence.  And although the government's reasoning has some force in cases involving buyer or seller defendants, we do not believe it overcomes the fundamental principle that the government bears the ultimate burden to establish the amount of drugs under negotiation.  Accordingly, we conclude that the government should be assigned the burden of establishing not only the negotiated amount of drugs, but also the defendant's intent or reasonable capability to produce them if the defendant has put those matters in issue.

2.

Having established where the burdens of persuasion and production lie in cases implicating the final sentence of Note 12, as well as the nature of those burdens, we now turn to Raven's claim of substantive error by the district court in applying Note 12. Raven's argument is essentially driven by the dictionary. Citing the American Heritage College Dictionary as authority for the proposition that the term "produce" means "to bring forth, create, or manufacture," Raven claims that Hilton's testimony at the sentencing hearing established that Raven neither intended to "produce" nor was reasonably capable of "producing" either heroin or money to pay for it. Appellant's Reply Br. at 10-11. Raven notes that Hilton's testimony established that Raven was neither a buyer nor a seller of heroin and that he could provide no financing for the scheme. App. at 58, 63, 68. This evidence, according to Raven, proves that he could not "produce" any heroin or any money to pay for the drugs.[10]

---

[10]. Raven also argues that Hilton's testimony proved that there was never any heroin to "produce" because Raven was the object of a DEA "sting" in which there never really was any heroin at all. App. at 61-62. But the fact that no drugs were really on their way into the United States as a result of Raven's conspiracy is simply a happy -- and all too infrequent -- curiosity of this case. That fact does not decrease the reprehensibility of Raven's crime: drugs cannot travel from faraway lands to our cities and neighborhoods without people who are ready, willing, and able to carry them. Nor does the fact that no drugs were ultimately involved in the conspiracy permit a court to ignore the actual amount of heroin -- three to four kilograms -- that Raven thought he was going to transport, intended to transport, and was capable of transporting.

In making this argument, however, Raven assigns too literal a meaning to the term "produce" and thus unreasonably constrains Note 12. We believe that the salutary last sentence of Note 12 must have some content in the world of courier sentencing, in order to force the government to demonstrate a courier's level of culpability when a drug transaction remains unconsummated and the courier's intent and ability to consummate the transaction are put in issue.[11] However, we agree with the government that to apply the principle embodied in Note 12, the focus must shift according to a defendant's role in the offense. Other courts addressing the language of Note 12 have not hesitated to interpret that language according to context. For example, the Fourth Circuit found that the language in question applied to a purchaser, because the note "speaks of `<u>traffic</u> in a controlled substance,' . . . a term sufficiently broad to encompass the purchase and sale of controlled substances." <u>Brooks</u>, 957 F.2d at 1151. Similarly, the Eleventh Circuit, confronted with a case in which the defendants were to procure and then sell an amount of drugs to an undercover agent, concluded that "[i]n this context, to `produce' means to obtain or deliver, as well as to manufacture." <u>Tillman</u>, 8 F.3d at 19.

---

[11]. Thus, we reject the plausible (but unsatisfying) argument, advanced by the government before the district court, that the last sentence of Note 12 applies only to drug sellers. App. at 39. The government does not press this argument before us, and it seems to us fundamentally unfair that only in cases involving unconsummated drug transactions by sellers would the government have to demonstrate that the defendant intended and was able to complete the negotiated transaction. We do not believe that the Sentencing Commission intended such a result.

Because of the variety of schemes that may be employed to traffic in narcotics, there are a multitude of situations in which a person's participation may result in the ultimate aim of a drug deal, which is to put drugs into someone else's hands in exchange for money.  It seems obvious, then, that the word "produce" must vary according to context.  "Produce" in the sense described in Tillman would apply where a defendant is a seller of drugs.  When the defendant is a drug buyer, Note 12 would address the quantity of drugs that the defendant intended to purchase and was reasonably capable of purchasing.  Brooks, supra.  And where, as in this case, a defendant has been convicted of conspiring to transport drugs, the proper focus is the quantity of drugs the defendant intended to transport and was reasonably capable of transporting.

Thus, Raven's contention that he had neither money nor drugs is irrelevant in a courier case.  The wrong being punished is the conspiracy to import drugs into the United States, and the issue for determination in the district court was what amount of drugs Raven intended to and had the capability to transport.

3.

Raven contends that if we conclude that the issue to be resolved under the last sentence of Note 12 is whether he had the intent and capability to transport a negotiated amount of heroin, we should remand to the district court for a determination of that issue and for resentencing. Other circuits which have addressed the language in the final sentence of Note 12 have concluded that a district court must make explicit findings as to intent and capability. United States v. Gessa, 971 F.2d 1257, 1263 (6th Cir. 1992) (en banc); United States v. Jacobo, 934 F.2d 411, 416 (2d Cir. 1991). We agree: it is necessary that district courts develop an adequate record for review when intent and capability are put in issue by the defendant. Although the district court did not anticipate our ruling and focus on whether Raven intended to transport and was reasonably capable of transporting the negotiated amount of heroin here, and did not make explicit findings in that regard, that is hardly surprising, for prescience is a tall order to fill.[12] We emphasize, though, that it is for the district court in the first instance to make these findings, and while in this case that may be a rather academic exercise,[13] we decline to usurp the district court's

___

[12]. Although the district court's ruling is not without ambiguity, it is clear that the court was not only aware of Raven's argument that Note 12 required a lower base offense level, but that it took testimony on the issue and considered Note 12 in determining that Raven should be held responsible for three to four kilograms of heroin. See App. at 88-96.

[13]. There appears to be ample evidence of Raven's intent and capacity to transport at least three to four kilograms of heroin. Concerning intent, as the district court found, "three to four [kilograms of heroin] was the opening salvo and one which was never rejected or debated." App. at 94. Furthermore, Raven

role and will instead remand for resentencing consistent with this opinion.

B.

In his second challenge to his sentence, Raven argues that because the government single-handedly determined the amount of drugs involved in the conspiracy, the district court should have departed downward from the otherwise applicable base level.

(..continued)
concedes in his brief that "he demonstrated his willingness to participate in the plan to import heroin and that he recruited another for this purpose . . . ." Appellant's Br. at 17-18. There was also unrefuted testimony that both Raven and Ramirez knew that they were going to transport the heroin in suitcases and that three to four kilograms of heroin could be transported in a single suitcase. See App. at 61, 51. And Raven tacitly agreed that the trip would not be worthwhile unless at least three or four kilograms of heroin were brought back to the United States. App. at 50.

As for capability, there is no need in this case to inquire into whether Raven had a source that could supply three to four kilograms of heroin, as there might be in a case in which the defendant was proposing to sell heroin to an undercover agent. Nor is there a need to inquire into whether Raven had a source of funding sufficiently large to purchase three to four kilograms of heroin, as there might be in a case in which a defendant was proposing to purchase heroin from an undercover agent. In a case such as this, in which a defendant acts as a mere courier transporting drugs from overseas, there would appear to be nothing more to the "reasonable capability" inquiry than determining whether the defendant had a passport, could travel to the assigned destination, could pick up and carry suitcases, and could return. Evidence presented at the sentencing hearing suggested that Raven was an experienced drug courier who had made runs to Thailand before. Furthermore, the record showed that Raven's discussions with Taju and Hilton at all times contemplated at least one suitcase being used for transport, and, again, testimony indicated that one suitcase could hold three to four kilograms of heroin. Additionally, the evidence established that Raven had recruited Ramirez to participate in the transportation, from which one might infer that the conspirators could transport at least one suitcase of heroin.

The government's behavior, Raven contends, constituted "sentencing entrapment," which has been defined as "`outrageous official conduct [which] overcomes the will of an individual predisposed only to dealing in small quantities' for the purpose of increasing the amount of drugs . . . and the resulting sentence of the entrapped defendant." United States v. Rogers, 982 F.2d 1241, 1245 (8th Cir. 1993), quoting United States v. Lenfesty, 923 F.2d 1293, 1300 (8th Cir. 1991).  Raven argues that the district court committed legal error in refusing to depart downward on this basis or, alternatively, that it failed to depart because it believed it lacked authority to do so.  Our review of both contentions is plenary.  See United States v. Spiropoulos, 976 F.2d 155, 160 n.2 (3d Cir. 1992) (failure to depart because of mistake of law); United States v. Love, 985 F.2d 732, 734 n.3 (3d Cir. 1993) (failure to depart because of uncertainty about authority to depart).

Contrary to Raven's argument that the district court may have believed that it did not have authority to depart downward because of entrapment by the government, the court in fact reached the issue.  Specifically, the court determined that the government's behavior did not amount to sentence entrapment, making departure on that ground inappropriate.  App. at 88-91. We have not as yet had occasion to address the theory of sentencing entrapment described in Rogers and Lenfesty, and we do not do so today, but we agree with the district court that Raven is not a candidate for departure based on that ground even assuming that the doctrine has vitality in this circuit.  Hilton

testified -- and Raven did not dispute -- that the government suggested that the conspirators import three to four kilograms of heroin, instead of some smaller amount, because in Hilton's experience it was not feasible for suppliers in Thailand or conspirators in the United States to "set up such a trip and bring back just one or two kilograms of heroin."  App. at 50.[14] And far from being entrapped, Raven was an experienced drug courier who demonstrated what can only be characterized as a yeoman's attitude towards this venture.  Hilton testified that when Raven was told that it would be necessary to import at least three to four kilograms of heroin in order to make the venture feasible, Raven responded that "whatever we had to bring back, there was no problem.  He was ready to bring it back.  He wanted this to be an ongoing thing.  He wanted to prove his loyalty and his trust.  He would bring back whatever was over there."  App. at 51.  Clearly, the district court did not err in refusing to depart downward for entrapment.

C.

Finally, Raven contends that the district court erred in finding that he was predisposed to import three to four kilograms of heroin.  Since we have found that there was no entrapment in this case, we need not reach the issue of

---

[14].    While it is true that the government later increased (from four kilograms to eight and then twelve) the amount of heroin that Raven was to have transported (App. at 54-55, 56-57), we need not address whether this behavior constituted an instance of impermissible "ratcheting" because the district court found Raven responsible for only three to four kilograms.

predisposition.  In any event, reviewing for clear error, <u>see</u> <u>United States v. Belletiere</u>, 971 F.2d 961, 964 (3d Cir. 1992), we note that the record indicates that Raven initiated the contact that led to the importation scheme, and when Taju and Hilton provided him the opportunity to participate, Raven not only immediately took it, but continued to demonstrate his enthusiastic support for the scheme until his arrest.  We find that the district court did not err here, either.

## III.

In conclusion, we do not gainsay that there is often something potentially troubling about an indictment that charges that a defendant conspired to traffic in narcotics, where the pleaded facts show that:  (1) the defendant had no means (money or contacts) to produce or sell any narcotics, and no means (money or credit) to buy narcotics; (2) the narcotics transaction in which he was supposed to be a courier never got off the ground; and (3) the deal was negotiated with a government informant and the co-conspirator was only another courier (recruited by the defendant).  There is, in these circumstances, no physical evidence of the crime, and not only conviction but also sentence will turn entirely upon the credibility of the government (and defense) witnesses.  However, the facts described in footnote 13 <u>supra</u> appear to be sufficiently concrete that there is no cause for such concern here.  Of course, we intimate no view as to what the district court should do on remand.

For the foregoing reasons, we will remand for resentencing as discussed in section II.A.3, and will affirm in all other respects.