RICHARD S. ARNOLD, Circuit Judge.
A jury convicted Delaine Berg of conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 846. Berg received a 30-year (360-month) prison sentence to be followed by a five-year term of supervised release. Berg appeals the conviction and sentence, raising a number of issues. He argues that outrageous government conduct led to a violation of his right to due process. He also raises a similar but distinct entrapment argument; argues that his conviction should be set aside because the District Court refused to declare a witness as hostile; and, finally, makes a sentencing entrapment argument. We do not agree with Berg’s arguments, and find no fault in the District Court’s[2] decisions. We therefore affirm both the conviction and the sentence.
I.
The events leading up to Berg’s conviction began with the arrest of Billy Hart and Richard Kearbey. On July 29, 1996, Hart and Kearbey were arrested in Arizona while attempting to buy methamphetamine (Trial Tr. 4, 46, 111, 144). Hart and Kearbey both agreed to cooperate with the government (Trial Tr. 4, 111-12). In exchange for Hart’s and Kearbey’s coopera *978 tion, the government agreed to ask for reduced sentences for both Hart and Kear-bey on the Arizona methamphetamine charge (Trial Tr. 4, 112). Hart and Kear-bey then met with Herman Hogue, a Drug Enforcement Administration agent in southeastern Missouri (Trial Tr. 4, 113). Hogue learned that Hart knew John Clayton (Trial Tr. 196). Hogue was interested in Clayton, and Hart knew Clayton was involved in trafficking methamphetamine (Trial Tr. 113). Under Hogue’s direction, Hart contacted Clayton to try to arrange a controlled buy of methamphetamine (Trial Tr. 196).
Hart and Kearbey first met with Clayton on August 29, 1996, at Clayton’s home, and then again on September 5 and September 10 (Trial Tr. 5, 7, 114, 115). On September 5, Clayton sold Hart and Kear-bey an ounce of methamphetamine and fronted them another ounce (Trial Tr. 7). On September 10, Hart and Kearbey paid for the 'ounce Clayton fronted them on September 5 (Trial Tr. 7). Clayton also fronted them a second ounce. Id. Hart testified that during the meeting on August 29, Clayton “showed interest in doing a meth cook” (Trial Tr. 114). It is not clear, however, who initially suggested manufacturing the methamphetamine. Kearbey testified that Clayton suggested manufacturing methamphetamine (Trial Tr. 15). Clayton, on the other hand, testified that the idea originated with Hart and Kearbey (Trial Tr. 398-401). Hart testified that at the meeting on September 10, Clayton indicated he knew someone who could cook the methamphetamine (Trial Tr. 116). Hart and Kearbey met with Clayton again on September 16 and September 24 (Trial Tr. 8, 10, 116-17). De-laine Berg, the defendant, was also present at the September 24 meeting, and, according to Hart, the four of them discussed doing “a large cook where everyone would make a lot of money” (Trial Tr. 117). Although Hart and Kearbey met Berg for the first time on September 24, Hart testified that he believed Clayton had already talked to Berg about cooking methamphetamine (Trial Tr. 117).
The meeting on September 24 was tape recorded by Kearbey (Trial Tr. 11). During the meeting Kearbey and Berg discussed the amount of methamphetamine to be cooked, as well as what Berg had cooked in the past:
Kearbey: “... Have you been making any quantities or just small?”
Berg: “... 1 make quarter pounds or something like that.”
Kearbey: “That’s why I like this, this
Berg: “You take as much risk.”
Kearbey: “Oh, yeah.”
Berg: “and as much trouble doing that as what if you make, you know, ten, twelve pounds. I mean I’d rather do it that way.”
Kearbey: “Well that’s what we figured out and it’s. You know, we would rather do the bigger deal. It’s the same damn risk.”
Berg: “Um huh.”
(Government Ex. 2, p. 14.) On October 7, Clayton gave Hart a list of ingredients needed to manufacture the methamphetamine, telling them that the list came from Berg (Trial Tr. 18, 127-28). Hart and Kearbey obtained the items on the list (Trial Tr. 23). They supplied the flasks and glassware necessary to manufacture the methamphetamine and the location where the manufacturing would occur (Trial Tr. 22, 174-75). They also helped Clayton soak down pills, supplied by Clayton, for the ephedrine necessary to manufacture the methamphetamine (Trial Tr. 21-22).
Kearbey testified that on October 15, Clayton brought Berg to Kearbey’s house (Trial Tr. 24). Hart, Kearbey, and Berg then went to the location secured by Kear-bey to manufacture the methamphetamine (Trial Tr. 24-25, 130). According to Ho-gue’s testimony, Hart and Kearbey notified Hogue that the cooking had started *979 (Trial Tr. 206). Hogue obtained a search warrant and, on October 16, during the manufacturing process, Berg was arrested (Trial Tr. 207-08). Berg was subsequently-indicted, tried, and found guilty of conspiracy to manufacture methamphetamine. Clayton pleaded guilty to the charge and was called as a witness by the defense. Berg now appeals his conviction, raising four separate issues. We will address each of those issues, but do not find that any of them warrants a reversal of Berg’s conviction or a reduction in his sentence.
II.
Berg first argues that the government’s extremely outrageous conduct led to a violation of his Fifth Amendment right to due process. The outrageous-conduct argument often arises in cases where the government has been involved in sting or reverse-sting operations. See United States v. Cannon, 88 F.3d 1495, 1506 (8th Cir.1996). The defense of outrageous conduct “focuses on the government’s conduct.” Id. (citing United States v. Kummer, 15 F.3d 1455, 1459 n. 9 (8th Cir.1994)). This defense is distinct from entrapment, which focuses on the defendant’s predisposition to commit a crime, and which also often arises in cases involving a sting or reverse-sting operation. See id.
Participation by government agents or informants in the illegal manufacture or distribution of drugs is a recognized means for the government to obtain convictions in drug-related offenses. See United States v. Russell, 411 U.S. 423, 432, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). When government agents or informants “go too far in manufacturing a crime and inducing a defendant into it,” however, their conduct may violate the defendant’s right to due process. Gunderson v. Schlueter, 904 F.2d 407, 410 (8th Cir.1990) (citing Russell, 411 U.S. at 431-32, 93 S.Ct. 1637). The Supreme Court has recognized that “some day” a case might arise where the government’s conduct is “so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.” Russell, 411 U.S. at 431-32, 93 S.Ct. 1637. The Supreme Court has yet to see that day.
This Court has stated that “[t]he level of ‘outrageousness’ needed to prove such a due process violation ... is quite high.” Gunderson, 904 F.2d at 410. And, like the Supreme Court, this Court has yet to see a case in which the government’s conduct rose to the level of such outrageousness. We have said that the government agent’s involvement “approached” a level of outra-geousness that would bar a conviction, but that is as close as we have come. United States v. Lard, 734 F.2d 1290, 1296 (8th Cir.1984). See also Gunderson, 904 F.2d at 411. The government agent in Lard went to the defendant’s house to see if he had any firearms for sale and, after rejecting the only thing the defendant had to offer (a detonator), asked the defendant to make a pipe bomb. Lard, 734 F.2d at 1292. The defendant had no prior criminal record and had never dealt in firearms or destructive devices. Id. at 1294. We found that the defendant had been entrapped as a matter of law. Id. We did not find, however, a violation of the defendant’s due-process rights. Id. at 1297.
In support of his argument, Berg cites a Third Circuit case in which a panel of the court found outrageous conduct by the government. The defendants in that case were also convicted of charges resulting from the illegal manufacture of methamphetamine. See United States v. Twigg, 588 F.2d 373, 374 (3rd Cir.1978). The Third Circuit has declined to follow Twigg, and its position has been called into doubt. See, e.g., United States v. Beverly, 723 F.2d 11, 12 (3rd Cir.1983); United States v. LBS Bank-New York, Inc., 757 F.Supp. 496, 499 n. 3 (E.D.Pa.1990). Moreover, the facts in Twigg are different from those in the present case. The government informant in Twigg played an active role in the entire operation. He contacted one of the defendants to discuss setting up a *980 methamphetamine laboratory and was completely in charge of the manufacturing process. See Twigg, 588 F.2d at 375-76. Production assistance from the two defendants was provided only at the informant’s direction. Id. at 376. In this case, Hart and Kearbey played a less substantial role in the events leading up to Berg’s, and Clayton’s, arrest. They initially met with Clayton only to see if they could purchase methamphetamine from him (Trial Tr. 196). Additionally, Kearbey’s and Clayton’s testimony differs as to who originated the idea to manufacture methamphetamine (Trial Tr. 15, 401). Berg himself preferred to make a large quantity. The government’s conduct in this case does not reach the same level as that in Twigg.
We recognize that the line between “covert investigative conduct ... that is within constitutional bounds” and conduct that is so outrageous as to shock the conscience of the court may sometimes be hard to draw. Cannon, 88 F.3d at 1506. The conduct of the government in this case, however, was not so outrageous as to violate Berg’s constitutional rights. We therefore deny Berg’s request to set aside his conviction on these grounds.
III.
Berg’s second argument is about entrapment. He argues that the District Court erred by refusing to instruct the jury on the entrapment defense. Unlike the defense of outrageous conduct, which focuses on the government’s conduct, the entrapment defense focuses on the defendant’s predisposition to commit the crime in question. Cannon, 88 F.3d at 1506. The defendant must show that the government induced the defendant to commit the crime. See id. at 1504. The prosecution then has the burden to prove that “the defendant was predisposed to commit the crime, apart from the government’s inducement.” Id. at 1504 (citing Jacobson v. United States, 503 U.S. 540, 553-54, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992)). If the defendant exhibits any predisposition to engage in the criminal conduct, the district court need not instruct the jury on entrapment. See United States v. Neal, 990 F.2d 355, 358 (8th Cir.1993). “[I]f predisposition exists, then there is not sufficient evidence from which a reasonable jury could find entrapment.” Id. (citations omitted).
Berg first met with Hart and Kearbey on September 24 (Trial Tr. 9, 117). Before that meeting, Berg and Clayton (who was not working with the government) privately discussed working with Hart and Kearbey to manufacture methamphetamine (Trial Tr. 117-18). Although Berg’s prior experience with manufacturing methamphetamine may have involved only small amounts of the drug, Berg readily agreed to manufacture the larger, twelve-pound amount (Government Ex. 2, p. 14). He indicated, in fact, that he’d “rather do it that way.” Id. Berg has not shown that he was induced by the government, through its informants, to commit the crime.
Even were we to agree with Berg that he was induced to manufacture methamphetamine, Berg did have a predisposition to commit the crime. His never having “cooked” such a large batch need not necessarily mean he was not predisposed to do so. “Predisposition ... focuses upon whether the defendant was an ‘unwary innocent’ or, instead, an ‘unwary criminal’ who readily availed himself of the opportunity to perpetrate the crime.” Mathews v. United States, 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988) (citations omitted). Berg had specialized knowledge in manufacturing methamphetamine. We do not believe Berg was an “unwary innocent” in this case. When the defendant has a predisposition to commit the crime for which he is charged, he cannot successfully argue that he was entrapped. The District Court, therefore, did not have to instruct the jury on entrapment.
*981 IV.
Berg also argues that his conviction should be set aside because the District Court limited his examination of John Clayton. Prior to Berg’s trial, Clayton pleaded guilty to conspiracy to manufacture methamphetamine in exchange for the prosecution’s agreement to tell the Court that he had cooperated (Trial Tr. 421-23). The prosecution did not call Clayton as a witness during Berg’s trial. Berg, however, did. During re-direct examination, Berg sought to examine Clayton as a hostile witness, and to be allowed to ask Clayton leading questions. The Court refused Berg’s request (Trial Tr. 447-48). Although Berg may have had difficulty seeking some of the information he wanted from Clayton, the record does not indicate that Clayton was a hostile witness. Berg argues that the Court’s refusal to declare Clayton a hostile witness led to a violation of his right to confront a witness against him. We find no merit in this argument. The decision to declare a witness hostile is generally within the discretion of the trial court and the Court did not abuse that discretion in this case. Berg was allowed to examine Clayton fully. We do not know what additional information Berg could have gotten out of Clayton if leading questions had been allowed.
V.
Finally, Berg makes a sentencing-entrapment argument. We have recognized that sentencing entrapment can occur. See United States v. Lenfesty, 923 F.2d 1293, 1300 (8th Cir.1991). Sentencing entrapment occurs when official conduct leads a defendant predisposed to deal only in small quantities of drugs to deal in larger quantities, leading to an increased sentence. See United States v. Barth, 990 F.2d 422, 424 (8th Cir.1993). Most of our previous cases involving senteneing-en-trapment arguments involved defendants who sold drugs to informants or undercover agents. See, e.g., Barth, 990 F.2d at 423; Lenfesty, 923 F.2d at 1295. In all of those cases the Court declined to find sentencing entrapment, and no downward departure in sentencing was permitted.
Berg argues that Hart and Kear-bey induced him to participate in a crime he was not otherwise predisposed to commit. Berg admits that he had manufactured methamphetamine prior to working with Clayton, Hart, and Kearbey, but states that he had never manufactured a batch as large as twelve pounds. He therefore seeks a downward departure in sentencing based on the idea that if he were convicted of manufacturing a lesser amount of methamphetamine—such as the quarter-pound batches he had previously manufactured—he would receive a shorter sentence under the sentencing guidelines. Berg argues that, as informants, Hart and Kearbey would benefit under their cooperation agreement with the government if they induced Berg to commit a crime with a greater sentence. In order to help themselves, in other words, Hart and Kearbey wanted Berg to manufacture twelve pounds of methamphetamine.
We agree with Berg that the amount of drugs involved in sting and reverse-sting operations can be easily manipulated by the government and, as Berg also notes, courts have begun to question the government’s power to control sentencing. “[W]e continue to be deeply concerned about the proclivity of reverse-sting operations ... to raise questions of sentencing entrapment.” United States v. Stavig, 80 F.3d 1241, 1247 (8th Cir.1996). Although Berg legitimately raises the question here, we do not agree with Berg’s construction of Hart’s and Kearbey’s conduct. There is no indication that they set Berg up to manufacture a greater amount of methamphetamine simply to enhance Berg’s sentence. Additionally, it appears that Berg preferred to manufacture the greater quantity. In any case, no great amount of persuasion was required.
*982 VI.
For the reasons discussed, we affirm both the conviction and the sentence imposed by the District Court.

. The Hon. E. Richard Webber, United States District Judge for the Eastern District of Missouri.