[No. S108309. Dec. 22, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
EDALEENE SHERRIE SMITH et al., Defendants and Appellants.

## Counsel

Phillip I. Bronson, under appointment by the Supreme Court, for Defendant and Appellant Edaleene Sherrie Smith.

Maxine Weksler, under appointment by the Supreme Court, for Defendant and Appellant Waymond Thomas.

Stephen Gilbert, under appointment by the Supreme Court, and William Flenniken, Jr., under appointment by the Court of Appeal, for Defendant and Appellant Obed Gonzalez.

Charles D. Weisselberg and John T. Philipsborn for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Defendants and Appellants.

Bill Lockyer, Attorney General, Manuel Medeiros, State Solicitor General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lance E. Winters, Jaime L. Fuster, Donald De Nicola and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BROWN, J.**—In our order granting the petitions for review in this case, we limited the issues to be briefed and argued to: (1) Whether the doctrine of "sentencing entrapment" recognized in some federal cases (see, e.g., *United States v. Staufer* (9th Cir. 1994) 38 F.3d 1103 (*Staufer*)) affords a defense to charged drug offenses or enhancements in state court; and (2) whether the federal defense of outrageous governmental conduct (see, e.g., *United States v. Bogart* (9th Cir. 1986) 783 F.2d 1428 (*Bogart*)) applies in state courts in addition to the entrapment defense under state law, which itself looks to the allegedly entrapping government conduct.

A jury convicted defendants of, among other crimes, attempting to transport a controlled substance—cocaine. (Health & Saf. Code, § 11352, subd. (a); hereafter section 11352(a).) The jury also found true an allegation that the quantity of cocaine involved exceeded 80 kilograms. Accordingly, defendants were each sentenced to an additional term of 25 years. (Health & Saf. Code, § 11370.4, subd. (a)(6); hereafter section 11370.4(a)(6).)

Defendants contend their sentences on the transportation counts should be modified by reducing the additional terms from 25 years to 15 years, the enhancement terms provided for transportation of quantities of controlled substances in excess of 20, but less than 40, kilograms. (Health & Saf. Code, § 11370.4, subd. (a)(4); hereafter section 11370.4(a)(4).) In arguing for the modification, defendants rely, first, on the related doctrines of "sentencing entrapment" and "sentencing manipulation."

While sentencing entrapment and sentencing manipulation are terms that some courts have used interchangeably,[1] as we shall use them, *sentencing entrapment focuses primarily on the subjective intent of the defendant,* while *sentencing manipulation focuses primarily on the objective conduct of the police.*

Under the theory of sentencing entrapment, a defendant's sentence should be reduced if he was *predisposed* to commit a lesser offense, but was entrapped by the police into committing an offense subject to greater punishment. (See, e.g., *Staufer, supra,* 38 F.3d at p. 1106.)

Under the theory of sentencing manipulation, a sentence should be reduced if law enforcement officials, for the purpose of increasing a defendant's

---

[1] Indeed, the case cited in our order limiting issues uses them interchangeably. "Sentencing entrapment or 'sentence factor manipulation' occurs when 'a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment.' [Citation.]" (*Staufer, supra,* 38 F.3d at p. 1106.)

sentence, engaged in conduct so *outrageous* as to violate the defendant's right to *due process*. (See, e.g., *United States v. Lacey* (10th Cir. 1996) 86 F.3d 956, 963–964 (*Lacey*).)

While the Court of Appeal rejected the doctrine of sentencing entrapment, it not only accepted the doctrine of sentencing manipulation, it significantly lowered the bar for finding a violation. "We do not believe a showing of 'outrageous' conduct is required in order to establish sentence manipulation. . . . Rather, we believe defendants establish sentence manipulation for purposes of the quantity enhancement when they show the police selected the amount of drugs for *no legitimate law enforcement purpose* but solely to maximize the defendants' sentence."

We reject the doctrine of sentencing entrapment as inconsistent with California entrapment doctrine, under which "the character of the suspect, his predisposition to commit the crime, and his subjective intent are irrelevant." (*People v. Barraza* (1979) 23 Cal.3d 675, 690–691 [153 Cal.Rptr. 459, 591 P.2d 947], fn. omitted (*Barraza*).)

In this case, the conduct of the undercover officer was far from outrageous; indeed, it was quite unexceptionable. Therefore, we need not decide here whether the doctrine of sentencing manipulation should be adopted in California. However, we do take this occasion to express our disapproval of the less rigorous test of sentencing manipulation adopted by the Court of Appeal—that the allegedly manipulative conduct has "no legitimate law enforcement purpose but [was undertaken] solely to maximize thedefendants' sentence." Were the doctrine of sentencing manipulation to be adopted in California, the predicate conduct should be truly *outrageous*. By contrast, as the United States First Circuit Court of Appeals observed, "garden variety manipulation claims are largely a waste of time." (*U.S. v. Montoya* (1st Cir. 1995) 62 F.3d 1, 4 (*Montoya*).)

In arguing for modification of their sentences, defendants also invoke a due process defense based on outrageous government conduct (outrageous conduct defense).

■ The federal test of entrapment, unlike the California test, is subjective and focuses on "the intent or predisposition of the defendant to commit the crime." (*United States v. Russell* (1973) 411 U.S. 423, 429 [36 L.Ed.2d 366, 93 S.Ct. 1637] (*Russell*).) In *Russell*, the Supreme Court, while reaffirming the federal subjective test for entrapment, left open the possibility of an objective constitutional defense based on due process: "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the

government from invoking judicial processes to obtain a conviction [citation], the instant case is distinctly not of that breed." (*Id.* at pp. 431–432.)

In California, unlike in federal courts, the test for entrapment focuses on the police conduct and is objective. Entrapment is established if the law enforcement conduct is likely to induce a *normally law-abiding person* to commit the offense. (*Barraza, supra,* 23 Cal.3d at pp. 689–690.)

We are, therefore, presented with this question: In California, in the context of an entrapment claim, is the outrageous conduct defense *superfluous* because our entrapment defense itself focuses on the conduct of law enforcement? Just as this case is the wrong case in which to address the viability in California of the doctrine of sentencing manipulation because the conduct of law enforcement here was quite unexceptionable, so, too, is it the wrong case in which to address the viability in this state of the outrageous conduct defense.

## FACTUAL AND PROCEDURAL HISTORY

The facts bearing on the limited issues before us may be briefly stated. Juan Martinez was an undercover narcotics officer. An informant of demonstrated reliability told Officer Martinez that defendant Edaleene Sherrie Smith was involved in drug trafficking and "ripping off" other drug dealers, and that Smith was very excited about the prospect of robbing a home where, on the instructions given him by another officer, the informant had told Smith that 200 kilograms of cocaine would be found.

In furtherance of the sting, Officer Martinez then met with Smith. Officer Martinez told Smith that he wanted to "rip off" a major drug dealer he worked for, and that the amount of cocaine involved would be between 30 and 100 kilograms. Smith assured Officer Martinez that she made her living that way, that she knew exactly what she was doing, and that she always used the same experienced three-person crew. Smith then informed Officer Martinez of her fee schedule: If the robbery yielded 30 kilograms of cocaine, she was to receive five kilograms for herself and nine more to divide among her crew, with the remainder going to the officer. If more than 50 kilograms were involved, the officer's share, Smith said, would be 60 percent.

In subsequent conversations, Officer Martinez gave Smith the address of a house and informed her that 85 kilograms of cocaine would be located in a van parked in an adjoining garage. Prior to the arrival of defendants, the officers had withdrawn, pursuant to a court order, 85 kilograms of cocaine from the property division of the police department and placed it in the van parked in the garage. The key was left in the ignition of the van. When

defendants arrived, Smith remained in the car, while codefendants Waymond Thomas and Obed Gonzalez entered the house and then the garage. As Thomas and Gonzalez began backing the van out of the garage, the police activated a remote-controlled switch that shut off the engine. Thomas and Gonzalez, as well as Smith, were then arrested.

As previously stated, a jury convicted defendants of attempting to transport cocaine, and the jury found true an allegation that the quantity of cocaine involved exceeded 80 kilograms. (Health & Saf. Code, §§ 11352(a), 11370.4(a)(6).) Smith and Thomas were also convicted of conspiracy to commit robbery (Pen. Code, § 182, subd. (a)(1)), attempted robbery (Pen. Code, §§ 211, 664), grand theft of an automobile (Pen. Code, § 487, subd. (d)), and grand theft of personal property (Pen. Code, § 487, subd. (a)). Smith received a sentence of 36 years in prison, including the 25-year quantity enhancement for attempting to transport more than 80 kilograms of cocaine. Thomas was given a prison sentence of 47 years eight months, including the 25-year enhancement. Gonzalez, who was convicted of the same charges, except for conspiracy to commit robbery, received a sentence of 33 years, including the 25-year enhancement.

The Court of Appeal affirmed defendants' judgments of conviction, but modified each defendant's sentence by reducing the sentence enhancement from 25 years to 15 years.

We reverse the judgment of the Court of Appeal insofar as it reduces defendants' 25-year sentence enhancement for attempting to transport more than 80 kilograms of cocaine (§ 11370.4(a)(6)). In all other respects, the Court of Appeal's judgment is affirmed.

## DISCUSSION

To reiterate, the questions presented by this case are whether the courts of this state should accept the defenses upon which defendants rely in contending their sentences should be reduced or their convictions reversed: (1) sentencing entrapment, (2) sentencing manipulation, and (3) outrageous conduct.

At the threshold, the Attorney General contends defendants forfeited the sentencing entrapment and sentencing manipulation claims by failing to raise them at the sentencing hearing. The contention lacks merit. Like some courts (*ante*, at p. 1211, fn. 1), defendants, in arguing the trial court should not impose the 25-year enhancements, did not distinguish between sentencing entrapment and sentencing manipulation. However, defense counsel made it abundantly clear they were invoking those concepts under the rubric of

entrapment. Clearly, neither the prosecutor nor the court was in any doubt as to the thrust of defendants' arguments. The officers had decided upon 85 kilograms of cocaine, the prosecutor responded, because the considerable risk of violence involved in home-invasion robberies meant the robbers had to foresee considerable rewards. In effect, the defendants were claiming, the trial court observed, that "there is some obligation of law enforcement in a sting operation to only use a minimum amount to minimize the penalty."

Moreover, the Court of Appeal addressed these claims, and an appellate court is generally not prohibited from reaching questions that have not been preserved for review by a party. (*People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6 [69 Cal.Rptr.2d 917, 948 P.2d 429].)

## I. Sentencing Entrapment

Four federal circuit courts of appeals—the First, Seventh, Eighth, and Ninth—appear to accept the doctrine of sentencing entrapment. (*United States v. Woods* (1st Cir. 2000) 210 F.3d 70, 75 (*Woods*); *United States v. Gutierrez-Herrera* (7th Cir. 2002) 293 F.3d 373, 377 (*Gutierrez-Herrera*); *United States v. Searcy* (8th Cir. 2000) 233 F.3d 1096, 1099 (*Searcy*); *Staufer, supra*, 38 F.3d 1106 [9th Cir.].)[2]

The United States Courts of Appeals of the District of Columbia and the Eleventh Circuit, and possibly also the Tenth Circuit, reject it. (*United States v. Walls* (D.C. Cir. 1995) 315 U.S. App. D.C. 111 [70 F.3d 1323, 1328–1330] (*Walls*) [one who agrees to commit a murder for hire deserves the sentence for that crime, even if he initially offered only to beat the victim up]; *United States v. Sanchez* (11th Cir. 1998) 138 F.3d 1410, 1414 (*Sanchez*) [Eleventh Circuit has rejected sentencing entrapment as a viable defense]; *Lacey, supra*, 86 F.3d at p. 963, fn. 5 [Tenth Circuit finds the analogy to entrapment at the sentencing phase is misplaced, for once a defendant crosses the reasonably bright line between innocence and guilt, his criminal inclination has been established, and the extent of the crime is more likely to be a matter of opportunity than of scruple].)

In the remaining federal circuits, the status of the doctrine is unclear. (See *United States v. Gomez* (2d Cir. 1997) 103 F.3d 249, 256 [validity of concept of sentencing entrapment not yet determined in Second Circuit]; *United States v. Raven* (3d Cir. 1994) 39 F.3d 428, 438 (*Raven*) [Third Circuit has

---

[2] Defendants have not brought to our attention, nor has our own research revealed, any other federal circuit court besides the Ninth Circuit Court of Appeals that has actually granted a downward departure from the federal sentencing guidelines on the basis of sentencing entrapment. (See, e.g., *United States v. Stavig* (8th Cir. 1996) 80 F.3d 1241, 1245 [although having repeatedly recognized the doctrine, "we have yet to find that sentencing entrapment existed under the facts of a particular case"].)

not yet had occasion to address theory of sentencing entrapment]; *United States v. Jones* (4th Cir. 1994) 18 F.3d 1145, 1154 (*Jones*) [Fourth Circuit has never addressed legal viability of sentencing entrapment theory]; *United States v. Snow* (5th Cir. 2002) 309 F.3d 294, 295 [Fifth Circuit has yet to determine whether sentencing entrapment is a cognizable defense to a sentence]; *United States v. Jones* (6th Cir. 1996) 102 F.3d 804, 809 [Sixth Circuit has never acknowledged validity of sentencing entrapment].)

■ We reject the doctrine of sentencing entrapment because, as the Court of Appeal below observed, the concept simply "does not fit with California's criminal law." (Accord, *People v. Graves* (2001) 93 Cal.App.4th 1171, 1179, fn. 5 [113 Cal.Rptr.2d 708] (*Graves*).) The federal doctrine of sentencing entrapment, like the federal doctrine of entrapment generally, focuses on the intent of the defendant and is subjective. (See *Woods, supra*, 210 F.3d at p. 75; *Searcy, supra*, 233 F.3d at p. 1099; *Gutierrez-Herrera, supra*, 293 F.3d at p. 377; *Staufer, supra*, 38 F.3d at p. 1106.) The California test of entrapment, by contrast, "focuses on the police conduct and is objective." (*People v. Watson* (2000) 22 Cal.4th 220, 223 [91 Cal.Rptr.2d 822, 990 P.2d 1031] (*Watson*).) Under the California test, "such matters as the character of the suspect, his predisposition to commit the offense, and his subjective intent are irrelevant." (*Barraza, supra*, 23 Cal.3d at pp. 690–691, fn. omitted.)

Another reason for rejecting the doctrine of sentencing entrapment, relied upon by the Court of Appeal in *Graves*, as well as by the Court of Appeal in this case, is that "California courts do not follow the same rigid sentencing guidelines as federal courts, so the need for a specific basis for departure from a guideline is not present." (*Graves, supra*, 93 Cal.App.4th at p. 1179.) Defendants here received 25-year quantity enhancements pursuant to section 11370.4(a)(6). Subdivision (e) of Health and Safety Code section 11370.4 provides: "Notwithstanding any other provision of law, the court may strike the additional punishment for the enhancements provided in this section if it determines there are circumstances in mitigation of the additional punishment and states on the record its reasons for striking the additional punishment." Rule 4.428(a) of the California Rules of Court provides in pertinent part: "If the judge has statutory discretion to strike the additional term for an enhancement, the court may consider and apply any of the circumstances in mitigation enumerated in these rules . . . ." The circumstances in mitigation enumerated in the rules include the fact that the defendant, "with no apparent predisposition to do so, was induced by others to participate in the crime." (Cal. Rules of Court, rule 4.423(a)(5).)

## II. Sentencing Manipulation

Again, under the theory of sentencing manipulation, as it is usually defined by the federal courts discussing the concept, a defendant's sentence should be

reduced if law enforcement officials, for the purpose of increasing the defendant's sentence, engaged in conduct that was so outrageous or extraordinary as to violate the defendant's right to due process of law. (See, e.g., *Montoya*, *supra*, 62 F.3d at p. 4 [in the First Circuit, "government's conduct must be viewed as 'extraordinary misconduct' "]; *United States v. Bala* (2d Cir. 2000) 236 F.3d 87, 93 [the status of sentencing manipulation is undecided in the Second Circuit, but would have to involve outrageous conduct]; *Raven*, *supra*, 39 F.3d at p. 438 [the theory of sentencing manipulation, which the court of appeals refers to as sentencing entrapment, has not yet been addressed by the Third Circuit, but has been defined by other courts as involving outrageous official conduct]; *Jones*, *supra*, 18 F.3d at p. 1154 [Fourth Circuit notes its "skepticism as to whether the government could ever engage in conduct not outrageous enough . . . to violate due process to an extent warranting a dismissal of the government's prosecution, yet outrageous enough to offend due process to an extent warranting a downward departure with respect to a defendant's sentencing"]; *United States v. Tremelling* (5th Cir. 1995) 43 F.3d 148, 151 (*Tremelling*) [the Fifth Circuit had previously addressed sentencing manipulation in the context of a due process claim, and the defendant failed to allege outrageous government misconduct in the case at bar]; *United States v. Berg* (8th Cir. 1999) 178 F.3d 976, 984 (*Berg*) (dis. opn. of Bright, J.) ["We properly test fact patterns for sentencing manipulation by examining the government conduct at issue to determine whether it served some legitimate law enforcement objective, or whether it was outrageous and aimed only at increasing the defendant's sentence"]; *United States v. Scull* (10th Cir. 2003) 321 F.3d 1270, 1276, fn. 3 [the Tenth Circuit addresses the issue of sentencing manipulation " 'under the appellation of "outrageous governmental conduct" ' "].)

While several federal circuit courts have discussed sentencing manipulation in dicta, not a single case has been brought to our attention where a federal circuit court approved a downward departure from the federal sentencing guidelines on this basis. (See *Sanchez*, *supra*, 138 F.3d at p. 1414 ["No court of appeals has overturned a conviction or departed downward on the basis of a sentencing manipulation claim"].)

At least four states have addressed the doctrine of sentencing manipulation. The Court of Appeals of New Mexico has apparently left the question open. (*State v. Rael* (1999) 1999 NMCA 68 [127 N.M. 347, 981 P.2d 280, 287] [under some circumstances continuing transactions may constitute unfair manipulation of a defendant's sentence, but no sentencing manipulation found in case at bar].) The Superior Court of Pennsylvania has adopted the doctrine of sentencing manipulation as defined by the outrageous conduct standard. (*Commonwealth v. Petzold* (Pa.Super.Ct. 1997) 701 A.2d 1363, 1366–1367 [sentence reduction an appropriate and just response to outrageous government conduct designed solely to increase a defendant's term of

incarceration].) The District Court of Appeal of Florida has adopted the lesser standard of sentencing manipulation embraced by the Court of Appeal here. (*State v. Steadman* (Fla.Dist.Ct.App. 2002) 827 So.2d 1022, 1024–1025 [no legitimate law enforcement purpose given for undisputed sentencing manipulation].) The Court of Criminal Appeals of Tennessee apparently accepts the doctrine of sentencing manipulation under the rubric of sentencing entrapment, but has not spelled out whether it adopts the outrageous conduct standard or some lesser standard. (*State v. Thornton* (Tenn.Crim.App. 1999) 10 S.W.3d 229, 244 [imposition of consecutive sentences for sale of narcotics may be inappropriate, " 'depending upon the number of specific buys the officers [choose] to conduct and the amounts purchased in each buy' "].)

A. *The Conduct of the Undercover Officer Here Was Unexceptionable, Hence We Need Not Decide Whether We Accept the Doctrine of Sentencing Manipulation.*

To reiterate, defendants were each sentenced to an additional term of 25 years for having attempted to transport more than 80 kilograms of cocaine, and they contend they should instead have received the 15-year additional terms applicable to more than 20 but less than 40 kilograms, because the undercover officer manipulated them into agreeing to steal more than 80 kilograms.

Even assuming arguendo that we accepted the doctrine of sentencing manipulation, defendants' contention would fail for the simple reason that it lacks any factual basis.

Sentencing manipulation, as we have said, focuses primarily on the objective conduct of the police. However, the conduct of the police does not occur in a vacuum, especially in a sting operation. The court's assessment of an officer's objective conduct will inevitably be colored by, for example, whether the defendant was from the start an enthusiastic proponent of the proposed crime or initially declined and was only gradually worn down.

When initially approached by the informant, defendant Smith expressed nothing but enthusiasm at the prospect of robbing a home where she was told 200 kilograms of cocaine would be found. When the undercover officer himself first met with Smith, he told her the amount of cocaine involved would be 30 to 100 kilograms. Smith did not express any preference for a transaction at the lower end of that range. To the contrary, Smith sought to reassure the officer that she was up to the job as described, telling him she made her living that way, that she knew exactly what she was doing, and that she always used the same experienced three-person crew. Indeed, rather than

expressing a concern about the large amount of cocaine potentially involved, Smith set out a fee schedule that actually gave the officer a discount for quantity: If the robbery yielded 30 kilograms of cocaine, Smith was to receive five kilograms for herself and nine more to divide among her crew, with the remainder of the cocaine, which would work out to 54 percent of it, for the officer. If more than 50 kilograms were involved, the officer's share, Smith said, would be 60 percent. In a subsequent conversation, the officer told Smith 85 kilograms of cocaine would be found at the designated location, and that was the sum actually found there. Again, there is no indication whatsoever that Smith expressed any qualms about the prospect of stealing 85 kilograms of cocaine, an amount that was well within the range that had been discussed from the outset. To borrow a phrase from the Third Circuit Court of Appeals, Smith "was an experienced drug courier who demonstrated what can only be characterized as a yeoman's attitude towards this venture." (*Raven*, *supra*, 39 F.3d at p. 438.)

It is quite clear that none of the federal circuit courts that accept the doctrine would find sentencing manipulation on these facts. In *Montoya*, *supra*, 62 F.3d 1, the defendants purchased 10 kilograms of cocaine, but contended they should have been sentenced on the basis of only three or four kilograms because the undercover agent had reduced the down payment for the cocaine from $50,000 to $25,000 in order to subject them to longer sentences. The First Circuit Court of Appeals rejected the contention, holding that the defendants had failed to show the extraordinary misconduct required in that circuit for a successful sentencing manipulation claim. (*Id.* at p. 4.) "All that [the undercover agent] did was to reduce the down payment in the face of claims by [the defendants] that they were short of cash to make the full down payment originally proposed. This is so far from government misconduct," the court of appeals explained, that it would not have published its opinion, but for two considerations, one of which was "to make very explicit the plain import of our previous cases: sentencing factor manipulation is a claim only for the extreme and unusual case." (*Ibid.*)

In *Tremelling*, *supra*, 43 F.3d 148, the defendant contended that undercover agents had engaged in sentencing manipulation by producing 240 pounds of marijuana when the defendant had contracted to buy only 150 pounds. The Fifth Circuit Court of Appeals had not previously addressed the viability of the doctrine of sentencing manipulation, but it had addressed similar contentions in the context of due process claims, and it found no due process violation in the case at bar. (*Id.* at pp. 151–152.) "Tremelling does *not* contend that he resisted taking the extra amount and that the government, through overbearing and outrageous conduct, overcame his resistance. [Citation.] He merely contends that the government brought the extra amount and offered it to him without requiring payment, which no drug dealer in his right mind would do. Tremelling's argument is not persuasive. 'Fronting' is a

recognized practice among drug dealers." (*Id.* at p. 151.) The conduct ascribed to the government—producing the extra 90 pounds of marijuana and offering to "front[]" the cost of it—did not constitute sentencing manipulation, the court of appeals held. (*Ibid.*)

In *United States v. Sivils* (6th Cir. 1992) 960 F.2d 587, the defendant, in arranging to buy $15,000 worth of cocaine, revealed in his conversation with the undercover cooperating witness that he believed he would receive somewhat less than 500 grams for that sum. Instead, the police delivered one kilogram of cocaine to the defendant, subjecting him to a higher sentence. The Sixth Circuit Court of Appeals said that if the defendant could demonstrate the government manipulated the dollar amount of cocaine to increase his sentence, "such manipulation would certainly provide a fundamental fairness defense against the higher sentence. The record reveals, however, that Jordan ratified the amount of cocaine actually sold to the defendants." (*Id.* at pp. 598–599, fn. omitted.)

In *United States v. Shephard* (8th Cir. 1993) 4 F.3d 647 (*Shephard*), in a drug sting that went on for eight months, the undercover officer purchased drugs from the defendant on 12 occasions, working her way up from an initial purchase of .2 grams of cocaine to a final purchase of 218.6 grams, and along the way, switching from paying for the drugs with cash to paying with food stamps. The defendant, convicted of 12 counts of selling cocaine, seven counts of accepting food stamps in payment for the drugs, and one count of conspiracy to distribute crack and cocaine, claimed he was a victim of sentencing manipulation, which he called sentencing entrapment. (*Id.* at pp. 648–649.) The Eighth Circuit Court of Appeals distinguished between sentencing entrapment and sentencing manipulation, and it found that neither was shown by the facts of the case. Of the defendant's sentencing manipulation claim, the court of appeals said: "We recognize that there could be situations in which the government engages in continuing undercover or sting transactions for the sole purpose of ratcheting up a sentence under the guidelines. We are aware that a potential for abuse exists, but abuse is not present on the record before us." (*Id.* at p. 649, fn. omitted.) The court of appeals added: "Shephard essentially asks the judiciary to fashion a code of conduct for sting operations, deciding at what point leading on even a willing criminal becomes unfair to the point of being unconstitutional. Obviously, any transaction in a sting after the first violation of law, however minor, will be subject to such attacks. Yet, we have established that it is legitimate for police to continue to deal with someone with whom they have already engaged in illicit transactions in order to establish that person's guilt beyond a reasonable doubt or to 'probe the depth and extent of a criminal enterprise, to determine whether coconspirators exist, and to trace the drug deeper into the distribution hierarchy.' [Citations.] The course of the transactions in this case shows a legitimate pattern of increasing amounts of drugs culminating

with the final 218 grams sale, which indicates that police did no more than persist in ascertaining what quantity Shephard was willing and able to deal." (*Ibid.*)

In *Lacey, supra*, 86 F.3d 956, the defendant claimed that the government's confidential informant, after purchasing smaller amounts of cocaine from the defendant's distributor on several previous occasions, purchased another five kilograms "for no reason other than to increase the quantity of drugs involved and thereby enhance the severity of his punishment." (*Id.* at p. 964.) Rejecting the defendant's claim of sentencing manipulation, the Tenth Circuit Court of Appeals found no fault with "the government's decision to seek a 'bigger buy' from [the defendant's distributor]. We have previously held that it is not outrageous for the government to induce a defendant to continue criminal activity 'or even to induce him to expand or extend previous criminal activity.' [Citation.]" (*Id.* at p. 965.)

Defendants here were merely given an apparent opportunity to do what Smith so proudly proclaimed they did for a living. Nevertheless, the Court of Appeal concluded that defendants were victims of sentencing manipulation because Smith had indicated that they "would do the theft for 30 kilos." ■ However, stings are permissible stratagems in the enforcement of criminal law (*Watson, supra*, 22 Cal.4th at p. 223), and the purpose of a sting is to catch criminals at work, not to find out how cheaply they will work. (See *Walls, supra*, 70 F.3d at p. 1329 ["Consider a defendant who agrees with an undercover agent to murder someone for a fee. Are we to suppose that if the defendant initially offered only to beat the person up, he should be sentenced as if that were his offense?"].)

### B. *The Standard for Sentencing Manipulation Proposed by the Court of Appeal is Rejected.*

It is unnecessary for us to decide in this case whether we accept the doctrine of sentencing manipulation because the conduct of the police here was not overreaching by any reasonable standard. However, we reject the standard of sentencing manipulation adopted by the Court of Appeal.

The Court of Appeal stated: "We do not believe a showing of 'outrageous' conduct is required in order to establish sentence manipulation. As discussed . . . [above], outrageous police conduct is a complete defense to the prosecution. Thus, in cases where out-rageous conduct has occurred there would be no need to reach the issue of sentencing. Furthermore, we surely need not wait until we find the sentence-manipulation equivalent of forced stomach pumping before we declare a violation of due process has occurred. Rather, we

believe defendants establish sentence manipulation for purposes of the quantity enhancement when they show the police selected the amount of drugs *for no legitimate law enforcement purpose but solely to maximize the defendants' sentence.*"

The federal circuit courts that accept the doctrine of sentencing manipulation, as well as those that reject it, caution against the adoption of such a standard. The First Circuit Court of Appeals entertains claims of sentencing manipulation. However, "[i]t is no accident," the First Circuit observed, "that statements condemning sentencing factor manipulation are usually dicta. A defendant cannot make out a case of undue provocation simply by showing that the idea originated with the government or that the conduct was encouraged by it [citation], or that the crime was prolonged beyond the first criminal act [citation], or exceeded in degree or kind what the defendant had done before. [Citation.] What the defendant needs in order to require a reduction are elements like these carried *to such a degree* that the government's conduct must be viewed as 'extraordinary misconduct.' [Citation.] [¶] The standard is high because we are talking about a reduction at sentencing, in the teeth of a statute or guideline approved by Congress, for a defendant who did not raise or did not prevail upon an entrapment defense at trial. The standard is general because it is designed for a vast range of circumstances and of incommensurable variables. [Citation.]" (*Montoya, supra,* 62 F.3d at pp. 3–4.) "Because of the diversity of circumstances," the court of appeals continued, "we have declined to create detailed rules as to what is or is not undue manipulation [citation], but we think it is useful now to be very candid in saying that garden variety manipulation claims are largely a waste of time." (*Id.* at p. 4.)

Another panel of the First Circuit Court of Appeals admonished: "By their nature, sting operations are designed to tempt the criminally inclined, and a well-constructed sting is often sculpted to test the limits of the target's criminal inclinations. Courts should go very slowly before staking out rules that will deter government agents from the proper performance of their investigative duties." (*United States v. Connell* (1st Cir. 1992) 960 F.2d 191, 196.) The Fourth Circuit, which has not yet decided whether it accepts the doctrine of sentencing manipulation, reiterated this admonishment. (*Jones, supra,* 18 F.3d at p. 1155.)

The Fifth Circuit Court of Appeals also appears to accept the doctrine of sentencing manipulation. However, it rejected the notion that governmental conduct should be "subject 'to a special brand of scrutiny when its effect is felt in sentence, as opposed to offense, determination.' [*United States v.*] Cotts [(7th Cir. 1994)] 14 F.3d [300,] 306, [fn.] 2.] Indeed, '[i]f we are willing to accept the assumption apparently approved by Congress that dealing in

greater quantities of drugs is a greater evil, it is not clear to us what the precise legal objection to governmental behavior based on cognizance of relative penal consequences in this area could be (so long as it does not rise to the level of true entrapment or conduct "so outrageous that due process principles would absolutely bar the government from invoking judicial processes[)]." ' *Id.* (quoting *United States v. Russell, supra,* 411 U.S. 423, 431–[4]32 [36 L.Ed.2d 366, 93 S.Ct. 1637])." *(Tremelling, supra,* 43 F.3d at p. 152.)

In *Shephard, supra,* 4 F.3d 647, the Eighth Circuit Court of Appeals, while accepting the doctrine of sentencing manipulation, declined the task effectively undertaken by the Court of Appeal here, that is, "fashion[ing] a code of conduct for sting operations." *(Id.* at p. 649.)

In *Lacey, supra,* 86 F.3d 956, in the course of rejecting the defendant's claim of sentencing manipulation, the Tenth Circuit Court of Appeals observed that although it recognized the viability of the outrageous conduct defense, it had never been presented with governmental conduct sufficiently egregious to warrant a dismissal. "The strict nature of the outrageous conduct inquiry is due in primary part to the reluctance of the judiciary to second-guess the motives and tactics of law enforcement officials. [Citation.] Government involvement is essential in the context of sting operations, which are often the only effective way to detect and to develop proof of illegal drug activity. To be sure, there is a point at which excessive government zeal may warrant judicial intervention. However, prior to that point, the courts will not fine tune conduct of law enforcement officials that does not 'offend the universal sense of justice.' [Citation.]" *(Id.* at p. 964.)

### III. The Outrageous Conduct Defense

We now come to the question embedded in the outrageous conduct defense asserted by defendants: In California, in the context of an entrapment claim, is the defense of outrageous law enforcement conduct superfluous because our entrapment defense itself focuses on the conduct of law enforcement?

The outrageous conduct defense has been called the "deathbed child of objective entrapment." *(United States v. Santana* (1st Cir. 1993) 6 F.3d 1, 3.) In *Russell, supra,* 411 U.S. 423, the Supreme Court reaffirmed the subjective test for entrapment focusing on "the intent or predisposition of the defendant to commit the crime." *(Id.* at p. 429.) However, the high court left open the possibility of an objective constitutional defense based on due process: "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a

conviction [citation], the instant case is distinctly not of that breed. . . . The law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice' mandated by the Due Process Clause of the Fifth Amendment." (*Id.* at pp. 431–432, quoting *Kinsella v. United States ex rel. Singleton* (1960) 361 U.S. 234, 246 [4 L.Ed.2d 268, 80 S.Ct. 297].) In *Hampton v. United States* (1976) 425 U.S. 484 [48 L.Ed.2d 113, 96 S.Ct. 1646] (*Hampton*), the high court again left open the possibility that a defendant might successfully invoke an outrageous conduct defense even if the entrapment defense were unavailable to him because of his predisposition to commit the crime.[3]

The vast majority of the federal circuit courts of appeals allow the outrageous conduct defense. (See, e.g., *United States v. Penagiarcano-Soler* (1st Cir. 1990) 911 F.2d 833, 839, fn. 1; *United States v. Rahman* (2nd Cir. 1999) 189 F.3d 88, 131; *United States v. Nolan-Cooper* (3rd Cir. 1998) 155 F.3d 221, 230; *United States v. Osborne* (4th Cir. 1991) 935 F.2d 32, 36; *United States v. Arteaga* (5th Cir. 1986) 807 F.2d 424, 426; *United States v. Quintana* (7th Cir. 1975) 508 F.2d 867, 878; *Berg, supra*, 178 F.3d at p. 979 [8th Cir.]; *Bogart, supra*, 783 F.2d at p. 1438 [9th Cir.]; *United States v. Mosley* (10th Cir. 1992) 965 F.2d 906, 909; *United States v. Capo* (11th Cir. 1982) 693 F.2d 1330, 1336; *United States v. Kelly* (D.C. Cir. 1983) 228 U.S. App. D.C. 55 [707 F.2d 1460, 1468–1469]; but see *United States v. Warwick* (6th Cir. 1999) 167 F.3d 965, 973–975 [outrageous conduct defense not available where defendant alleges inducement].)

While the test for entrapment in California is objective and focuses on the conduct of law enforcement (*Barraza, supra*, 23 Cal.3d at pp. 689–690), this court, like the United States Supreme Court, has left open the possibility that we might accept the outrageous conduct defense. In *People v. McIntire* (1979) 23 Cal.3d 742 [153 Cal.Rptr. 237, 591 P.2d 527], in the course of rejecting the prosecution claim that entrapment cannot be effected through an unwitting agent, an argument that would have permitted unconscionable law enforcement activity so long as the target of entrapping agents was not reached directly but indirectly through the use of unsuspecting dupes, we observed: "Sufficiently gross police misconduct could conceivably

---

[3] *Bogart* parsed *Hampton*: "The *Hampton* plurality concluded that the defendant's predisposition to the crime would bar an outrageous conduct defense. [*Hampton, supra*, 425 U.S.] at 490 (Rehnquist J., joined by White J. and Burger C. J.). Justices Powell and Blackmun concurred in the result but stated their view that a due process outrageous conduct defense *would* be available in an appropriate case, although '[p]olice overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction.' *Id.* at 495 n. 7 (Powell J., concurring). The three dissenters reaffirmed their belief in the objective entrapment rule and would have held that the police conduct was sufficiently offensive to bar Hampton's conviction. *Id.* at 497 (Brennan J., dissenting, joined by Stewart J. and Marshall J.). Thus, a majority of the court recognized the potential availability of an outrageous police conduct defense no matter what the defendant's criminal predisposition." (*Bogart, supra*, 783 F.2d at p. 1432, fn. omitted.)

lead to a finding that conviction of the accused would violate his constitutional right to due process of the law. (See, e.g., *People v. Isaacson* (1978) 44 N.Y.2d 511 [378 N.E.2d 78, 406 N.Y.S.2d 714].)" (*McIntire*, at p. 748, fn. 1.)[4]

In *Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561 [28 Cal.Rptr.2d 638, 869 P.2d 1163], we rejected the claim that the practice of using mature-looking minors to buy alcoholic beverages rose "to the level of 'overbearing' conduct needed to constitute entrapment under *Barraza*." (*Id.* at p. 569.) We rejected the petitioners' due process claim, as well, and in the course of doing so, we assumed, simply for the sake of argument, that "the *Russell* doctrine applies in this state." (*Id.* at p. 570.) We noted, however, that a contrary conclusion had been reached in *People v. Thoi* (1989) 213 Cal.App.3d 689 [261 Cal.Rptr. 789] (*Thoi*). (*Provigo*, at p. 570.)

In California, *Thoi* concluded, the defense of outrageous conduct is superfluous. "[U]nder federal law, there is a rationale for the defense of outrageous police conduct in entrapment-type situations. The conduct of the police may be so egregious that the sanction of dismissal would be appropriate notwithstanding the defendant's propensity to commit the crime. In California, where entrapment law looks primarily at the conduct of the authorities in the first instance, the defense of outrageous police conduct is superfluous. We hold the doctrine does not exist separately within the context of entrapment cases." (*Thoi, supra*, 213 Cal.App.3d at p. 696, fn. omitted.) That said, the *Thoi* court, upon examining the challenged police conduct, found it did "not rise to the level necessary for [the defendant] to prevail on the outrageous conduct issue . . . ." (*Id.* at p. 697.)

In *People v. Holloway* (1996) 47 Cal.App.4th 1757 [55 Cal.Rptr.2d 547] (*Holloway*),[5] the Court of Appeal disagreed with *Thoi* to the extent *Thoi* rejected the outrageous conduct defense in entrapment cases. (*Holloway*, at p. 1767.) However, the *Holloway* court found the defendant in that case could claim neither the entrapment nor the outrageous conduct defense because he was not himself affected by the alleged police overreaching. (*Id.* at pp. 1767–1768.)

The Court of Appeal here treated outrageous conduct as a viable defense, but found "nothing shocking or offensive about the police conduct." In *People v. Wesley* (1990) 224 Cal.App.3d 1130 [274 Cal.Rptr. 326], one of its own earlier decisions, this Court of Appeal identified four factors a court should consider in determining whether due process principles had been

---

[4] The *McIntire* statement is, of course, dictum. (*In re Martin* (1987) 44 Cal.3d 1, 55 [241 Cal.Rptr. 263, 744 P.2d 374].)

[5] *Holloway, supra*, 47 Cal.App.4th 1757, was disapproved on an unrelated ground in *People v. Fuhrman* (1997) 16 Cal.4th 930, 947 [67 Cal.Rptr.2d 1, 941 P.2d 1189].

violated by outrageous police conduct: (1) whether the police manufactured a crime that otherwise would not likely have occurred, or merely involved themselves in an ongoing criminal activity; (2) whether the police themselves engaged in criminal or improper conduct repugnant to a sense of justice; (3) whether the defendant's reluctance to commit the crime is overcome by appeals to humanitarian instincts such as sympathy or past friendship, by temptation of exorbitant gain, or by persistent solicitation in the face of unwillingness; and (4) whether the record reveals simply a desire to obtain a conviction with no reading that the police motive is to prevent further crime or protect the populace. (*Id.* at p. 1144.) These factors, the *Wesley* court said, are only illustrative and no one is, in itself, determinative. Each factor should be viewed in context with all pertinent aspects of the case and proper law enforcement objectives. (*Ibid.*)

None of the factors it had identified in *Wesley*, the Court of Appeal found, are present in this case. "While it is true the police approached Smith and not vice versa they did not do so on a whim or out of personal malice. Rather, the police acted on information from a dependable informant that Smith was engaged in drug trafficking and home invasion robberies. The informant . . . had established his reliability with the federal Drug Enforcement Agency by providing its agents with information for the past 13 years. [The informant] had also worked with Detective Alvarez of the Los Angeles Police Department who orchestrated the sting operation in this case. Furthermore, before the police initiated the sting [the informant] had two conversations with Smith in which she confided to him 'she had some people that will do some rip-offs.' [The informant] asked Smith 'if she would be interested in doing one.' Smith affirmed her interest, telling [the informant] she and her crew were 'professionals' and '[knew] how to handle that kind of work' because she had been doing these robberies '10 years and . . . never even been caught.' Our review of the record shows Smith never expressed any reluctance to steal the cocaine nor did [the informant] or the police exert any pressure on her to do so. On the contrary, just prior to executing the robbery Smith told Detective Martinez, the undercover officer directing the crime, to 'continue with the plan' and 'don't back off.' Smith repeatedly emphasized to [the informant] and Martinez they had nothing to worry about because she and her crew knew what they were doing, nobody would get hurt and everyone would get their cut.

"After hearing [the informant's] reports of his conversations with Smith and listening to a secret recording of one of their meetings the police designed an operation in which an undercover officer was introduced to Smith by [the informant]. The undercover officer, Martinez, told Smith he wanted her help to 'rip off' a big-time drug dealer. When Smith agreed to do the job, the police proceeded to arrange the sting. . . . In the present case the police did not manufacture a crime that otherwise would not have occurred but involved

themselves in Smith's criminal activity, which, by her own admission, she had been pursuing for the past 10 years.

"The record does not show the police in this case were motivated simply by a desire to obtain a conviction but rather demonstrates they were motivated by a desire to stop a robbery ring that had operated undetected for the past decade and to protect the public from the violence which could easily result when a gang of thieves attempts to steal pure cocaine from a drug lord."

We are left with the question we started with: In California, in the context of an entrapment claim, is the defense of outrageous law enforcement conduct superfluous because our entrapment defense itself focuses on the conduct of law enforcement? This case, in which the conduct of law enforcement was entirely unexceptionable, is the wrong case in which to resolve this question.

## DISPOSITION

The judgment of the Court of Appeal is reversed insofar as it reduces defendants' 25-year sentence enhancement for attempting to transport more than 80 kilograms of cocaine (§ 11370.4(a)(6)). In all other respects, the Court of Appeal's judgment is affirmed.

Baxter, J., Chin, J., and Moreno, J., concurred.

**WERDEGAR, J.,** Concurring.—I concur in the result, but decline to join the majority in its unnecessary, potentially confusing, and questionable discussion of certain issues.

Having concluded the claim of sentencing manipulation "lacks any factual basis" (maj. opn., *ante*, at p. 1218) because "the conduct of the police here was not overreaching by any reasonable standard" (*id.* at p. 1221), the majority (*id.* at pp. 1221–1223) nonetheless goes out of its way to reject the test adopted by the Court of Appeal—viz., whether there was any legitimate law enforcement purpose or bona fide reason for the police conduct—even though that court's opinion, by virtue of our grant of review, is no longer citable authority. (Cal. Rules of Court, rule 976(d).)

The majority's extended discussion of the Court of Appeal's test is also unnecessary because, even under the rejected standard, this is not a case requiring a sentence reduction. The prosecution posited, and the defense failed to rebut, a plausible legitimate law enforcement purpose for the police decision to use 85 kilograms of cocaine in their sting operation: given the

high risk of violence involved in theft of the type contemplated, the officers could reasonably have believed a relatively large quantity was more likely to keep Smith and her crew committed to the enterprise.

Moreover, the majority's criticism of the Court of Appeal's sentencing manipulation standard appears to be unjustified. Contrary to the majority's implication, not all courts "caution against the adoption of such a standard" (maj. opn., *ante*, at p. 1222). (See *United States v. Shephard* (8th Cir. 1993) 4 F.3d 647, 649 [suggesting sentencing manipulation might be found where "the government engages in continuing undercover or sting transactions for the sole purpose of ratcheting up a sentence"]; *United States v. Sivils* (6th Cir. 1992) 960 F.2d 587, 598–599 ["If [the defendant] could demonstrate that the government manipulated the dollar amount of cocaine to increase his sentence, such manipulation would certainly provide a fundamental fairness defense against the higher sentence"]; *State v. Steadman* (Fla.Dist.Ct.App. 2002) 827 So.2d 1022, 1025 [sentence reduction warranted where police extend sting operation against the defendant "for no reason other than to enhance his or her sentence"].) Consequently, were this court actually presented with the issue in a proper case, it is at least possible it would similarly conclude that government conduct with no legitimate law enforcement purpose, designed solely to increase a defendant's sentence, was so outrageous as to warrant a sentence reduction. In any event, to purport to decide the issue here, while at the same time declining to decide whether the doctrine of sentencing manipulation even applies in California, is to engage in gratuitous dictum.

The majority also addresses the question whether "the defense of outrageous law enforcement conduct [is] superfluous because our entrapment defense itself focuses on the conduct of law enforcement" (maj. opn., *ante*, at p. 1223), though after considerable discussion it reaches no conclusion because the facts here show no outrageous conduct (*id.* at p. 1227). I agree with regard to the police conduct in this case, but in place of the majority's unhelpful and inconclusive discussion I would explain the potentially important differences between the doctrines of entrapment and outrageous law enforcement conduct.

The due process "defense" of outrageous law enforcement conduct is actually a *bar to prosecution* rather than a defense to the charge; as such, it is properly raised by motion and decided by the court. (*People v. Wesley* (1990) 224 Cal.App.3d 1130, 1138 [274 Cal.Rptr. 326]; see also *People v. Thoi* (1989) 213 Cal.App.3d 689, 695–697, fns. 2 & 4 [261 Cal.Rptr. 789].) In contrast, entrapment is a *defense to the charge* and is decided by jury trial. (*People v. Barraza* (1979) 23 Cal.3d 675, 691, fn. 6 [153 Cal.Rptr. 459, 591 P.2d 947]; *People v. Thoi, supra,* at p. 693.) The constitutional bar of

outrageous law enforcement conduct, moreover, may be invoked against police or prosecutorial conduct that does not involve inducement to crime and therefore cannot serve as the basis for an entrapment defense. (*People v. Holloway* (1996) 47 Cal.App.4th 1757, 1767 [55 Cal.Rptr.2d 547]; *People v. Thoi, supra*, at p. 696, fn. 3.)

The two doctrines are therefore distinct both substantively and procedurally. They do overlap substantively in a particular factual context, i.e., "[i]n cases where the thrust of the defense is that the government improperly instigated the crime." (*People v. Thoi, supra*, 213 Cal.App.3d at p. 696.) But that an area of overlap exists does not make either doctrine redundant and provides no reason to doubt that in a proper case of outrageous conduct, whether or not including government inducement to crime, the defendant may be able to obtain dismissal of the action on due process grounds.

George, C. J., and Kennard, J., concurred.