Filed 8/30/16  P. v. Tran CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067919 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD248768) |
| PHUOC TRAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Sharon B. Majors-Lewis, Judge.  Affirmed.

Patrick Morgan Ford for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and Tami Falkenstein, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant Phuoc Tran guilty of 12 counts of committing a lewd act upon a child.  The crimes were against four different children.  As to each victim, the jury also found true that defendant had substantial sexual conduct with a child under the age

of 14 and committed the crime against more than one victim. The court sentenced defendant to 15 years to life on counts 1 through 12, for a total term of 180 years to life.

Defendant's central appellate contention concerns the fact that one of the victims did not have an evidentiary medical examination after she reported the sexual abuse. Defendant contends the failure to conduct the examination constitutes outrageous governmental conduct requiring a complete dismissal of all of the charges and/or violates his due process rights to the collection and preservation of exculpatory evidence. He also contends the court erred in failing to sua sponte instruct the jury that the absence of a medical examination may establish reasonable doubt of his guilt. Defendant additionally contends the court erred in admitting evidence of uncharged sexual abuse against a fifth alleged victim under Evidence Code section 1108.[1]

We determine defendant's contentions are without merit and affirm the judgment.

FACTUAL AND PROCEDURAL SUMMARY

Because defendant does not raise a substantial evidence challenge, we do not provide a comprehensive description of all the evidence presented during the lengthy trial. Instead, our factual summary focuses on the prosecution and defense evidence relevant to the specific contentions raised on appeal. In the Discussion section, we will describe additional relevant evidence.

---

[1] All statutory references are to the Evidence Code unless otherwise specified.

*Prosecution Case*

In 2013, defendant was married and lived with his elderly parents (Grandparents). Defendant had six adult siblings, all of whom had children. At the time, the extended family was close and celebrated birthdays and other milestone events together. The children of the siblings (the cousins) often played together. The family had immigrated from Vietnam, and many of the adults spoke only Vietnamese.

One of defendant's brothers has three sons (Michael, age 22; Peter, age 17; David, age 16), and one daughter (M, age 11) (ages at the time of trial). Another one of defendant's siblings has one child, a daughter (C), who was 18 at the time of trial. Another one of defendant's siblings (Tracy) has two children. Tracy's husband's niece is D, who was 17 at the time of trial.

The jury found defendant committed lewd acts against four of these younger relatives: siblings Peter and M, their cousin C, and D. The abuse occurred at various times and over many years. None of these children immediately reported the misconduct. When they later reported, some of the reporting was gradual.

*Chronology of Disclosures*

The disclosures were triggered by a family event that took place at the Grandparents' home during the weekend of May 17 through May 19, 2013 (the Family Party). The extended family was celebrating a birthday and anniversary, and many family members stayed overnight at the Grandparents' house (where defendant lived; and Peter and C also lived while going to school).

3

During the Family Party, Peter saw defendant take Peter's nine-year-old sister M into defendant's bedroom. When Peter attempted to open the door, it was locked. Peter went into an adjacent room and listened through a closet, and thought he heard moans. Peter was concerned because he and C had recently told each other about incidents of sexual abuse by their uncle (defendant) when they were much younger.

M later testified that she had been playing with her younger cousin, when defendant asked her to go into his room. When she did so, he locked the door and told her to take off her clothes. M pulled her pants and underwear down to her knees and laid on defendant's bed. At first, she was on her back and defendant touched his penis to her vagina. M saw defendant's penis through "a hole on [his] underwear." After telling M to turn over, defendant put his penis into her "butt." Someone knocked on the door and defendant said "wait." Defendant and M then put their clothes back on and M left the bedroom. M was not crying and "acted normally" when she left the room. As detailed below, this form of abuse had occurred many times since M was five years old.

After this event occurred, Peter and several of the cousins met in a room, and told M to come in the room. Peter then asked if defendant had touched her inappropriately. M repeatedly denied it, but Peter kept pushing her to tell the truth. After about 20 minutes, M admitted that defendant had done so. She said defendant told her not to tell anyone. The older cousins then had lengthy discussions about what to do with the information. Some wanted to confront defendant; others wanted to tell the adults; and others (Peter) wanted to call the police.

4

On Monday evening following the Family Party, Peter called the police and told them that defendant had been molesting younger relatives, including Peter's younger sister (M) and 16-year-old cousin (C), and that defendant had molested him when he was about eight years old. Peter's father and the Grandparents were extremely angry at Peter's report and instructed him to tell the police that he had lied about the abuse. Peter called 911 and told the officers he was afraid for his safety, and he spent the night in protective custody.

Shortly after Peter's report, on May 21, C was interviewed by a social worker, who came to her high school unannounced. After initially denying the abuse, C began crying and told the social worker that defendant had touched her " 'down there.' " When asked what she meant, she said her "vagina." She said defendant "tried to have sex" with her and tried to "penetrate" her. She said this conduct occurred at nighttime on multiple occasions. She said it began when she was nine years old and that it stopped when she was 12 or 13 years old when she began locking her bedroom door. Later that day, when her cousin Michael (Peter's older brother) picked her up from school, C told him that defendant had repeatedly touched her "down there" when she was in her bedroom. C said she did not tell an adult about the abuse because she feared it would ruin the family.

On that same day, Peter and M's mother heard about Peter's accusations and picked up M from school early. When M's mother asked M whether she had gone into a bedroom alone with defendant, M responded that she could not say. After M's mother told her she loved her and repeatedly said that M needed to tell the truth, M disclosed some of the conduct to her mother. M's mother testified that M said that defendant

5

"Asked her to come in the room. Asked her to lay down on the bed and pull her pants down to her knees. . . . [M] [s]aid that uncle [defendant] took his [penis] and touch her butterfly [vagina]." When M's mother asked her if she was hurt, M responded that "it was not inserted inside," but "her uncle pull it out" after M said "Ouch. Ouch." M said that defendant told her not to "say this to anybody including the parents." M denied that she was in pain or had bled. M's mother examined M's vaginal area and did not see any visible injury.

Later that day (May 21), a social worker told M's mother to bring M to Children's Hospital to be interviewed. During the car ride, M was told by her father and/or mother not to tell the truth and to lie and say that nothing happened. They were worried about the health of defendant's mother if defendant was arrested. When M was interviewed by social worker Laurie Fortin later that day, M denied that anything had occurred. She said that she had made up the story to her brothers and cousins because they were "asking so [many] times."

Two weeks later, on June 4, M's mother admitted to police officers that M had disclosed the abuse and that she had instructed M to lie to social workers. The next day, on June 5, M's mother brought her back to Children's Hospital to be reinterviewed by the same social worker. During the second interview, M disclosed that defendant began abusing her when she was about five years old. M described how defendant would rub his penis on her vaginal area, but she denied any penetration. M did not have a medical examination on that date, and there was no evidence that police officers or the social

6

workers recommended or asked M's parents to permit a doctor to conduct an examination.

Two months later, at the preliminary hearing on August 29, M elaborated on her disclosures. At the hearing, M disclosed for the first time that defendant also touched his penis to her "butt," and that the touchings had occurred outside and inside her vaginal and anal areas.

About 10 days after M first disclosed the abuse to the social worker, in mid-June 2013, D's family received a phone call from relatives in Vietnam about the accusations against defendant. The relative said D had been identified as a possible victim and told D not to disclose any abuse. After receiving the phone call, D began crying and told her parents she had been sexually abused by defendant when she was about eight years old. D had not been at the Family Party, and was not in contact with Peter. Several days later, D's parents called police officers, who interviewed D.

Several months later, in about February or March 2014, Children's Hospital (through an investigator) called M's parents requesting that M be brought in for a medical examination. M's parents ignored the phone calls, and declined to bring her in for the examination.

During the first trial that took place in April and May 2014, the jury was unable to reach a unanimous verdict on any of the charges concerning Peter, C, M, or D. After the trial, the prosecutor learned that Peter and M's brother David was also alleging that he was abused by defendant when he was younger.

*The Second Trial*

The second trial took place in February and March 2015. At the trial, C retracted her allegations against defendant and testified she made up the accusations to get defendant in trouble. There was evidence that C was under substantial pressure from her parents and other relatives not to testify against her uncle. However, the three other alleged victims (M, Peter, and D) testified in detail about the sexual abuse committed by defendant.

Eleven-year-old M testified to the incident in the bedroom during the Family Party (as summarized above), and also provided more detail about the past abuse. In summary, she said that defendant touched his penis to her vagina "[a] bunch of times" ("more than 10 times") beginning when she was in kindergarten. She said that defendant "push[ed]" his penis inside her "middle" (vaginal area) and "pushed" his penis inside the "hole" in her butt on numerous occasions (more than 10 times). She said these acts made her feel uncomfortable, and that she would feel pain "[w]hen he did it too hard." She said that defendant also used his hands to touch her chest. M said she did not tell her parents or her brothers because defendant told her not to tell anyone. She described various additional details, including the places where the abuse occurred (mainly bedrooms and bathrooms in various family homes).

Seventeen-year-old Peter testified that when he was eight years old defendant came into his bedroom and rubbed Peter's testicles and penis for a lengthy period, telling Peter that it was a medical examination. He also described a similar touching in a room in a hair salon owned by a family member. Peter also described conversations with C in

8

which she disclosed that defendant had sexually abused her on multiple occasions when she was younger.

Seventeen-year-old D testified that when she was eight or nine years old, she had a sleepover with her cousin C. As D was falling asleep, defendant came into the bedroom and began touching her legs. Defendant then pulled D's pajama pants down and began touching her "private spot" (vagina). Defendant put his mouth on her vagina until D stopped it by getting up. Defendant then told her to go back to sleep and left the room. D woke up C to tell her what happened. D did not tell an adult what had happened because she was scared. When D was in eighth or ninth grade, she told her best friend (Y) about the molestation. In her testimony, Y confirmed this information. D also testified that, during another sleepover, C and D stayed up late at night and had a discussion about defendant. D and C each told the other about defendant molesting them.

The prosecution additionally presented the testimony of 15-year-old David, the brother of Peter and M. As described in more detail below, David testified that defendant repeatedly touched his penis and testicles from the time David was about six or eight until he was about 13.

The evidence also showed some of the adults in the extended family (defendant's siblings and parents) were pressuring these witnesses to recant their accusations.

*Defense*

Defendant testified at trial, and denied engaging in any abuse against any of the children. The defense theory was that Peter asserted the false accusations against defendant because Peter hated his uncle and was seeking revenge because defendant was

9

always yelling at him to clean his room and to act in a more responsible way. To support this theory, defendant presented evidence that Peter was a leader of his younger siblings and his cousins and that Peter had urged these younger relatives to report abuse by his uncle. Defense counsel argued that Peter used his leadership position to convince David, M, D, and C (at least initially) to make false accusations against defendant.

*Verdict*

The jury found defendant guilty of 12 separate counts of lewd act upon a child against M, D, C, and Peter. (Pen. Code, § 288, subd. (a).) As to M, the jury found defendant guilty of four lewd act offenses: two counts of "Penis to Vagina" (charged as "First Time" and "Last Time") and two counts of "Penis to Butt" (charged as "First Time" and "Last Time"). As to D, the jury found defendant guilty of two lewd act offenses: one count of "Mouth to Vagina" and one count of "Hand to Vagina." As to C, the jury found defendant guilty of two counts of "Touching Private Parts" (charged as "First Time" and "Last Time") and two counts of "Touching Breasts" (charged as "First Time" and "Last Time"). (Capitalization omitted.) As to Peter, the jury found defendant guilty of two lewd act counts ("Hand to Penis" and "Hand to Testicles"). (Capitalization omitted.) The jury was unable to reach a verdict on an additional count pertaining to Peter (the alleged abuse at the nail salon), and that count was dismissed.

DISCUSSION

I. *Lack of Medical Examination*

Defendant raises several appellate contentions arising from the fact that no medical examination was conducted on M after she initially disclosed the sexual abuse to

10

authorities. We first summarize the evidence relevant to the medical examination issue, and then address each of the contentions. We find no error.

A. *Relevant Facts*

M first disclosed the abuse to authorities on June 5 about 17 days after the last abuse incident. She disclosed during a forensic interview with a social worker at the Chadwick Center at Rady's Children's Hospital (Chadwick Center). At that time, M reported penis to vagina contact, but indicated the touching was on the outside of her vaginal area. There was no evidence showing that the social workers or law enforcement officials requested or recommended that M undergo a physical examination at that time.

At trial, the prosecution and defense each presented a medical expert who testified on the issue of whether a medical examination should have been performed and what findings might have been expected if an examination had been performed. The prosecution's expert was Dr. Jennifer Davis, the medical director of the Chadwick Center. The defense expert was Dr. Lynne Ticson, a pediatrician specializing in child sexual abuse who is the chief physician at Los Angeles County juvenile hall facilities.

Dr. Davis testified that the Chadwick Center does not generally perform a medical examination if a child is denying any contact. Dr. Davis said she was not consulted when M first disclosed the abuse about three weeks later, and she did not know why M was not initially offered a medical examination. Dr. Davis testified that generally if a child reports sexual abuse or sexual assault within 72 hours of the incident (characterized as the "acute" period), an examination should be conducted for forensic purposes, but after that time, the purpose of an examination is primarily for healthcare reasons. She explained

11

that well-established scientific studies show after the 72-hour period (or at the very most one week), physical injuries will be present in less than 5 percent of cases, and anal injuries are "extremely rare" and will be present in only 1 to 3 percent of cases. She also said that even with sexual intercourse on young girls, the vaginal "area heals rapidly and heals completely most of the time." She stated that for a 10-year-old girl, a swab for DNA or sperm cells is generally conducted only within 72 hours of the alleged abuse because beyond that time period it is unlikely that any such evidence would remain. She also said that girls will often have a normal intact hymen even after sexual intercourse. She additionally stated that young girls often misidentify touching as penetration, explaining that touching to the outer vaginal area can feel to a young girl that the finger or penis has gone "inside" the vagina.

Dr. Ticson's opinions were essentially consistent with Dr. Davis's testimony on these issues. Dr. Ticson acknowledged that most sexual abuse injuries "heal rapidly" and most sexual abuse examinations of children do not result in physical findings, particularly after the 72-hour period. She agreed that studies have found that " 'Even with a history of severe abuse, such as vaginal or anal penetration, the rate of abnormal medical findings is only 5.5 percent.' " Dr. Ticson discussed a possible exception to this rule if there is blunt force trauma and "full penetration" into a five- or six-year-old girl's vaginal area. She said with such force, there could be substantial injury, including disruption of the hymen, vaginal tearing, bleeding, and internal damage. Dr. Ticson said that absent this form of trauma (which she said frequently does not occur with family member sexual abuse), most sexual abuse examinations of children do not result in physical findings. She also

12

acknowledged that sometimes children do not have bleeding even if "sex is forced upon them." She said that although a forensic medical examination of the vaginal area is "gentle," if the child denies any abuse occurred, an examination is not "automatically done" and she would not force a child to have an examination. Dr. Ticson agreed that the history from the child is the most important diagnostic feature in determining whether abuse occurred.

B. *Analysis of Contentions*

1. *Claimed "Outrageous" Government Conduct*

Defendant contends the court had a duty to dismiss all criminal charges because the undisputed evidence shows the state acted in an "outrageous" manner by failing to require M to undergo a medical examination. Defendant argues that the examination "would almost certainly have shown whether [M] had been regularly raped and sodomized for four years as she said."

Defendant forfeited this argument by failing to raise it below. The proffered defense requires an analysis of facts, and is not purely a legal issue. (See *People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439, 445-446 (*Velasco-Palacios*).)

Even if we were to reach the issue, the contention has no merit. M first reported penis-vaginal contact about 17 days after the last incident. Both the prosecution expert and the defense expert testified it is unlikely that a medical examination would disclose injuries after the 72-hour period. This defeats defendant's contention that the examination "would almost certainly" have shown whether he committed the crime. Moreover, on the date of the first disclosure, there was no indication that M had been

13

"regularly raped and sodomized."  M denied there was any penetration, and there was no indication she was in any kind of pain or distress.  On this record, there is no basis for finding the social workers and/or law enforcement officials acted in an "outrageous" manner by failing to offer a forensic medical examination.  Although both experts testified they would have preferred to have a medical examination at this first disclosure, both indicated this was primarily for healthcare reasons, and not to obtain evidence of the abuse.

Moreover, it is unclear whether and under what circumstances a wrongful governmental action can serve as valid grounds for dismissing criminal charges.[2]  But assuming the validity of this defense, it precludes a prosecution only " 'in the rarest and most outrageous of circumstances' " (Miller, *The Case for Preserving the Outrageous Government Conduct Defense* (1996) 91 Nw.U. L.Rev. 305, 321), where a prosecution would violate " 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process clause of the Fifth Amendment."  (*United States v. Russell* (1973) 411 U.S. 423, 432.)

For example, in *Velasco-Palacios*, the reviewing court upheld the dismissal of criminal charges based on the trial court's finding that the prosecutor had *deliberately* altered an interrogation transcript to *add a false confession* and had provided the

[2]     In 1979, the California Supreme Court suggested in dicta that "[s]ufficiently gross police misconduct could conceivably lead to a finding that conviction of the accused would violate his constitutional right to due process of the law." (*People v. McIntire* (1979) 23 Cal.3d 742, 748, fn. 1.)  More recently, the court left open the question whether this defense exists and the manner in which it should be raised (pretrial or during trial) in an entrapment case.  (*People v. Smith* (2003) 31 Cal.4th 1207, 1223-1227.)

transcript to defense counsel when the prosecutor knew the counsel was attempting to convince the defendant to settle the case. (*Velasco-Palacios, supra*, 235 Cal.App.4th at pp. 446-452.) Focusing on the prosecutor's "conscience shocking" conduct of adding false information to a transcript and finding that this conduct materially interfered with the defendant's right to counsel, the court determined the dismissal of the criminal charges was the appropriate sanction. (*Ibid*.)

There is no similar basis to dismiss the criminal charges in this case. Unlike a deliberate falsification of a defendant's pretrial interrogation, there was no evidence showing the absence of a forensic medical examination on M reflected bad faith or any form of fundamental unfairness.

### 2. *Claimed Due Process Violation for Failure to Preserve Evidence*

In a related argument, defendant contends his due process rights were violated because the state did not preserve potentially exculpatory evidence by conducting a forensic medical examination on M. He argues the failure to conduct the examination violated his due process rights because it was "likely" to show his "guilt or innocence."

Defendant forfeited this argument by not raising it below. He asks this court to nonetheless reach his contention because it is "an important constitutional issue" and "the facts here are undisputed." However, the forfeiture doctrine applies to constitutional issues. (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17; *People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347, fn. 9.)

Moreover, the relevant undisputed facts do not support defendant's contention.

15

Under *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*), the state has a duty "to *preserve* 'evidence that might be expected to play a significant role in the suspect's defense.' " (*People v. Montes* (2014) 58 Cal.4th 809, 837, italics added.) Defendant is asking this court to extend that principle to impose a duty on the state to *collect* potentially exculpatory evidence. Even assuming there is support for such an extension (see *Montes*, at p. 838; *Miller v. Vasquez* (9th Cir. 1989) 868 F.2d 1116, 1120), a *Trombetta* duty arises only where the exculpatory value of the evidence is "apparent" (*Montes*, at p. 837). As discussed above, it would not have been apparent to law enforcement officials that a medical examination would benefit defendant's case. The testimony from both experts supported that when M first disclosed the abuse, it was unlikely there would be any physical findings to support a true claim of abuse. Thus, a physical examination would have little or no probative value to support a defense to the sexual abuse charges.

Further, there is no due process violation on a failure-to-preserve claim unless the defendant shows law enforcement acted in bad faith with an "animus towards [the defendant] or [a] conscious effort to suppress exculpatory evidence." (*Trombetta, supra*, 467 U.S. at p. 488.) There was no evidence of a conscious effort to suppress evidence in this case.

Defendant contends an "important constitutional issue" is "whether there is a due process obligation for the police to gather potentially exculpatory evidence . . . through a routine medical exam that would *likely* show the defendant's guilt or innocence as to one of the victims . . . ." (Italics added.) However, this issue is not presented here because

16

the factual predicate is missing. There is no evidence in the record showing the medical examination would "likely show . . . defendant's guilt or innocence . . . ."

3. *Instruction Regarding Adverse Inference from Lack of Medical Examination*

Defendant contends the court erred in failing to sua sponte instruct the jury that "if [M] had been physically examined, there would have been no evidence of an injury, even a healed injury, and that fact alone could be found to establish reasonable doubt." We reject this argument because the proposed instruction is not an accurate statement of the law or facts.

Defendant relies on *People v. Zamora* (1980) 28 Cal.3d 88 (*Zamora*), in which the California Supreme Court reversed the defendant's convictions for resisting arrest and assaulting police officers because the officers' personnel files were *wrongfully* destroyed by the city before trial. (*Id.* at pp. 93-104.) In remanding the case for retrial, the high court determined that as a sanction for the city's *wrongful destruction of the evidence*, the jury should be instructed the destroyed files contained evidence the officers had used excessive force in the past and that the jury may rely on this information to infer the officers were prone to use excessive or unnecessary force. (*Id.* at pp. 99-103.)

*Zamora* is inapplicable here. There is no showing a public entity engaged in wrongful conduct in this case. No evidence was destroyed and there was no duty to conduct a medical examination under the circumstances. Moreover, defendant's proposed instruction is incorrect and confusing. Even according to his own expert, the absence of injuries to a child abuse victim does not constitute reasonable doubt. As

17

stated above, Dr. Ticson testified that "most" examinations of children do not result in physical findings.

Because the instruction is not legally correct, there was no sua sponte duty for the court to give the instruction. (*People v. Kelly* (1992) 1 Cal.4th 495, 532.) We likewise reject defendant's contention that his counsel was ineffective for failing to request the instruction.[3]

## II. *Police Interviews Did Not Preclude a Fair Trial*

Defendant contends the trial was unfair because the investigating officers acted wrongfully by asking "leading and improper questions" to minors. Defendant forfeited this argument because it was not asserted in the court below. Additionally, the argument fails on its merits.

Defendant primarily focuses on an interview of a witness (E) who never testified at trial. The trial court excluded E's testimony because it found the questioning was "highly suggestive" and "unprofessional." Because the jury was unaware of this interview and there is no indication the verdicts were based on statements made by E, there are no grounds for reversing the judgment based on the interview.

---

[3] At various points in his appellate briefs, defendant also suggests error regarding the absence of a medical examination on C. For the same reasons we have rejected the outrageous conduct and due process arguments as to M, we find them unavailing as to C. Defendant does not cite, nor has our independent review disclosed, any evidence supporting that a forensic examination of 16-year-old C would have revealed evidence relevant to defense claims, particularly because the abuse stopped three or four years earlier when C was 12 or 13.

With respect to the two other claimed suggestive interviews, we have examined the relevant testimony and find there was nothing fundamentally unfair about the interviews. First, with respect to C, defendant complains that the police officers asked her leading and suggestive questions. However, despite these questions, the record reflects that C (who was 16 years old at the time) had previously volunteered specific information about the abuse to social workers. In recanting her accusations, C did not suggest her earlier statements were the result of an unfair police interview; instead she said she intentionally made up the false accusations to help Peter get her uncle into trouble. C's statements to the police officers were also corroborated by Michael, C's cousin, who had previously been in a close and friendly relationship with defendant. Shortly after C first disclosed, Michael picked up C from school, and on the way home, C repeated the same accusations against defendant. Finally, defense counsel conducted a strong cross-examination of the police officers involved in the interview, and the jury had full information to decide whether C's responses were the result of an unfair interview or were made independently.

Second, with respect to Y's interview, defendant complains that the prosecutor made improper efforts before trial to "get [Y] to say that [D] told her she had been 'molested' by appellant." The record does not support this assertion. Defendant cites only to defense counsel's argument to the court, and not to any alleged unfair questions. Further, after reviewing Y's testimony, we are satisfied that Y testified from her own recollection and that any statements made to her during the pretrial interview did not improperly influence her testimony. Y was careful to explain that she remembered only

19

generalities about the conversations with D. Defense counsel was given substantial latitude to vigorously cross-examine Y regarding her memory of the conversations, and the jury, as the trier of fact, had full information to decide whether Y was credible.

III. *Court Did Not Err in Admitting David's Testimony Under Section 1108*

Defendant next contends the court erred in admitting David's testimony.

A. *Factual Background*

Before trial, the prosecutor moved to admit the testimony of 16-year-old David (the brother of Peter and M) under section 1108, which permits the admission of uncharged sex offenses as propensity evidence. The prosecutor made an offer of proof that David would testify that defendant touched David's penis when he was between the ages of eight and 10 years old. The prosecutor said he had been previously unaware of David's allegations because his parents had refused to permit an interview with him. The prosecutor said that when the parents finally allowed a conversation, David disclosed the abuse.

Defendant opposed the motion on numerous grounds, including that the alleged improper touching was remote; David's statement lacked credibility as there is no corroborating evidence; David likely had been "pressured by his older brother Peter to join him in the allegations"; and the testimony would be confusing as defendant was not being charged with the alleged conduct against David.

The court decided to conduct a section 402 hearing to consider David's credibility and the potential relevance of the evidence. At the hearing, David testified he "remember[ed] a few occurrences where [defendant] has touched my private place,"

20

meaning "my testicles and my . . . balls." He later clarified that he was referring to his penis and his testicles. He said his uncle would "grab" his penis and "move it around" and would "grab [his testicles] and squeeze." He said this occurred on multiple occasions from the time he was six or seven years old until he was 13 years old when he "started becoming a teenager." David said he did not tell anyone because he was afraid.

During cross-examination, David said he was told he had been asked to testify because "Peter . . . said that [defendant] raped him and also me." He testified that during the Family Party, Peter repeatedly attempted to "convince" him that he had been raped by his uncle, but that he (David) had denied it. David also said he had been "[c]onflicted" about what he should do because Peter had told him "what to say," whereas his father had instructed him to "lie" about his uncle (defendant). But David also testified that Peter told him he "should always tell the truth and never make stuff up, even if you can't remember and stuff . . . ." David also made a series of conflicting statements about whether and when he spoke with his mother about defendant's conduct, and the nature of that disclosure.

After considering the testimony and arguments, the court ruled David's testimony was admissible under section 1108. The court reasoned that it found David was believable, despite that there would be substantial room for cross-examination on bias, memory, and credibility issues. The court noted that David appeared to be immature, nervous, and not highly articulate, and it was uncertain whether "this is all a figment of his imagination or if he was really touched." But the court found it was the jury's role to make this credibility determination.

21

At trial, David testified that defendant touched his penis and testicles many times under and over his clothes. He said defendant "would thrust his hand under my pan[t]s," and would squeeze his testicles and would "move[ ]" his penis "around." He said the touchings began when he was six or eight years old, and continued until he was 13 years old. He said he was "[v]ery certain" that these touchings had occurred. He said that they happened when he was alone in a bedroom with his uncle and identified the houses where the abuse had taken place. David said he never told his parents because he did not know how they would react. He said he did not disclose the touchings to anyone until he spoke with the prosecutor in September 2014.

Regarding the Family Party, David remembered one "cousins" meeting, and said that during the meeting Peter kept telling him that he had been "raped" by his uncle and David had repeatedly denied it.[4] David also said he spoke with Peter about coming to court, and Peter told him to "[a]lways tell the truth." David said his father (defendant's brother) told him to lie and not disclose any abuse and that David would "be dead to him" if David did not "lie." During cross-examination, David agreed he had previously said Peter told him to say that he was molested.

### B. *Legal Principles*

Section 1101 prohibits the admission of evidence to show a defendant's propensity to commit a particular crime. Section 1108, subdivision (a) creates an exception to this rule by permitting the admission of a prior sexual offense for any relevant purpose,

---

4    On redirect, David clarified that Peter had probably used the word molested rather than raped.

22

including to show the defendant's propensity to commit the current sexual offense. (*People v. Loy* (2011) 52 Cal.4th 46, 60; *People v. Falsetta* (1999) 21 Cal.4th 903, 911.) "With the enactment of section 1108, the Legislature 'declared that the willingness to commit a sexual offense is not common to most individuals; thus, evidence of any prior sexual offenses is particularly probative and necessary for determining the credibility of the witness.' " (*People v. Soto* (1998) 64 Cal.App.4th 966, 983.)

Defendant does not challenge that David's testimony was potentially admissible under section 1108 as propensity evidence, but contends the court erred in denying his motion to exclude the evidence under section 352.

In considering the admission of section 1108 sexual offense evidence, the court should conduct a section 352 balancing analysis and exclude the evidence if "its probative value is substantially outweighed by the probability that its admission will necessitate undue time consumption or create substantial danger of undue prejudice, confusing the issues, or misleading the jury." (*People v. Loy, supra*, 52 Cal.4th at pp. 61-64; accord, *People v. Falsetta, supra*, 21 Cal.4th at p. 917.) This determination " 'is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.' " (*Falsetta, supra*, 21 Cal.4th at pp. 917-918.) We must uphold the trial court's ruling unless it " 'falls outside the bounds of reason.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 371; see *People v. Avila* (2014) 59 Cal.4th 496, 515; *People v. Loy, supra*, 52 Cal.4th at p. 61; *People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1098.)

The court did not abuse its discretion. David's testimony about the abuse reflected actions similar to the charged conduct—engaging in secretive sexual abuse against his prepubescent nieces and nephews within the family homes. Defendant's actions against David (if believed by the jurors) were thus highly probative to show defendant had the propensity to commit this type of crime and made it more likely he engaged in comparable acts against David's siblings and cousins. Additionally, David's testimony was brief and there was little likelihood the jury would become confused or distracted by the evidence. Further, the abuse against David was not more inflammatory than the charged crimes. If anything, it was relatively less substantial. Unlike the abuse committed against M and C, the offenses involved fondling and not attempted penetration.

In arguing the court abused its discretion, defendant focuses primarily on issues surrounding David's credibility, particularly given David's late reporting and his admissions that his brother Peter had told him what to say. However, as the trial court found, the weaknesses in David's testimony pertained to the weight of the evidence, not its admission. The court had the opportunity to observe and consider David's testimony, and found that he was fundamentally a believable witness on the basic fact that he had been subjected to unwanted sexual touchings by defendant. After hearing the testimony and viewing David's demeanor and body language, the court said that "I do not feel he's lying." The court recognized the weaknesses in David's testimony and that a jury may not agree with its credibility assessment, but found the jury should have the opportunity to consider the evidence and make its own determination.

24

The court did not abuse its discretion in reaching these conclusions. The reliability and credibility of a witness are matters for the jury to decide, and therefore inconsistencies in the testimony or biases or memory problems generally are not grounds for precluding the admission of the evidence under section 352. (See *People v. Merriman* (2014) 60 Cal.4th 1, 57; *People v. Anderson* (2001) 25 Cal.4th 543, 587; *People v. Mullens* (2004) 119 Cal.App.4th 648, 660.) Although David suggested at times that he was told what to say by Peter, he also said Peter told him to tell the truth and that he was conflicted because his father was telling him to lie and say there was no improper conduct. The court did not abuse its discretion in finding the jury should make the credibility determination.

We also reject defendant's contention the evidence should have been excluded because it was remote. According to David's testimony, the sexual touchings continued until he was about 13 years old. Since David was 16 years old when he testified, the abuse evidence was not remote. Further, many of the alleged abusive acts against David occurred during the same period as the charged offenses.

We likewise reject defendant's contention the evidence was unduly cumulative. There was no other evidence showing David had also been a victim of defendant's sexual abuse, and the fact that defendant had also abused Peter's younger male sibling had material probative value. In this regard, it is significant that the trial court refused to permit the prosecutor to present the testimony of two other claimed victims under section 1108. This ruling shows the court carefully weighed the proposed testimony and understood the scope of its discretion to disallow section 1108 evidence. Based on the

25

court's detailed explanation for its ruling, we are satisfied the court carefully balanced the relevant factors, and acted within its discretion in determining the defendant did not meet his burden to show the probative value of David's testimony was substantially outweighed by the prejudicial effect.

Further, even assuming the court abused its discretion in admitting the prior sexual offense evidence, the error is not reversible unless the defendant shows a reasonable probability he would have obtained a more favorable result had the court excluded the prior acts evidence. (See *People v. Gonzales* (2011) 51 Cal.4th 894, 924; *People v. Falsetta, supra*, 21 Cal.4th at pp. 924-925; *People v. Walker* (2006) 139 Cal.App.4th 782, 808; *People v. Mullens, supra*, 119 Cal.App.4th at pp. 658-659.) Defendant has not made this showing in this case.

Defense counsel effectively cross-examined David regarding his memory, his late disclosure, and the pressure various family members placed on him regarding his testimony. Under the circumstances, it is highly doubtful the jury would have been persuaded that defendant was guilty of the charged offenses based solely on David's testimony. If anything, David's testimony had the potential to help defendant's case. Portions of David's testimony supported the defense theory that Peter had convinced his cousins and siblings to falsely accuse defendant in order to retaliate against defendant. David's statements that during the Family Party, Peter repeatedly told him he had been "raped" by defendant and that David had denied this assertion was consistent with the defense case. On our review of the entire record, we are confident that even if the court had not permitted David to testify, the outcome would have been the same. On this issue,

26

we find unhelpful defendant's focus on the fact that David did not testify in the first trial. Without a full comparison between the trials, it is speculative to conclude that this one witness made the difference in the outcome.

## IV. *No Cumulative Error*

Defendant contends we must reverse his conviction because the accumulation of errors deprived him of a fair trial. Because we have rejected his contentions of error, we necessarily reject the cumulative error claim. (*People v. Vieira* (2005) 35 Cal.4th 264, 294; *People v. Bolin* (1998) 18 Cal.4th 297, 335.) The record demonstrates that defendant received a fair trial and the verdicts were supported by substantial evidence.

## V. *Judicial Notice*

Defendant requests that we take judicial notice of an expert declaration that was submitted in support of a habeas corpus petition in an unrelated child abuse case. We deny this request. The declaration was not presented in the proceedings below, and defendant provides no persuasive reason for this court to consider the declaration for the first time here. (See *People v. Catlin* (2001) 26 Cal.4th 81, 170-171; *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) Additionally, there are no appropriate statutory grounds for judicial notice, and the information contained in the document is not relevant on the issues before us. The declaration was authored by an expert who was not subject to cross-examination and who was offering opinions concerning different victims and a different defendant. Further, even if we were to consider the declaration, it would not change the outcome of this appeal.

DISPOSITION

Judgment affirmed.

HALLER, Acting P. J.

WE CONCUR:


O'ROURKE, J.


PRAGER, J.*

---

*       Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28